HONORABLE BENJAMIN H. SETTLE

UNITED STATES DISTRICT COURT, WESTERN DISTRICT OF WASHINGTON
AT TACOMA

DINAH CANADA, MARIE JOHNSON-PEREDO and ROBERT HEWSON on behalf of themselves and all others similarly situated,

    Plaintiffs,

    v.

MERACORD, LLC; LINDA REMSBERG and CHARLES REMSBERG, individually and on behalf of the marital community;
LLOYD E. WARD and AMANDA GLEN WARD, individually and on behalf of the marital community; LLOYD WARD, P.C.; LLOYD WARD & ASSOCIATES, P.C.; THE LLOYD WARD GROUP, P.C. (D/B/A LLOYD WARD GROUP II); WARD HOLDINGS, INC.; and SETTLEMENT COMPLIANCE COMMISSION, INC.

    Defendants.

No. 12-cv-05657-BHS

AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

## I.     INTRODUCTION

1.     Many Americans suffered – and continue to suffer – extreme financial and emotional hardships as a result of the recent financial crisis dubbed the "Great Recession." From these difficult times rose a highly profitable industry purporting to provide "debt relief" to financially troubled and over-extended consumers. While there are, no doubt, some companies in the debt-relief industry that provide genuine assistance to consumers, there are also countless bad actors who see a consumer in financial distress as just another mark. Meracord, formerly known as

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 1
Case No. 12-cv-05657-BHS
010262-13 561082 V1



HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1   NoteWorld, LLC, is a perfect example of the latter. To Meracord and its network of co-

2   conspirators, the Great Recession offered not hardship, but windfall profits through exploitation

3   of those suffering financial distress.

4       2.    Meracord engages and relies upon a network of "front-end" debt settlement

5   companies ("Front DSCs") – including Lloyd Ward & Associates and its various related entities

6   – that it utilizes to recruit customers. The Front DSCs offer to act as intermediaries between

7   distressed and distraught debtors and their creditors, using inflated claims and misrepresentations

8   about their services to sign up customers, and charging exorbitant and abusive fees once the

9   mark is on the hook. The Front DSCs require customers to set up an escrow account into which

10  the customer makes a monthly deposit, generally via an automatic electronic funds transfer.

11  These accounts are administered by Meracord, which is a "back-end" debt settlement company.

12  In theory, once a sufficient balance accumulates in the escrow account, the Front DSCs will

13  approach creditors and utilize the accumulated balance to settle outstanding debts for a lump sum

14  in return for fees that are strictly regulated by law. The reality, however, is different.

15      3.    The Front DSCs and Meracord represent to consumers that Meracord is independent

16  and unaffiliated with the Front DSCs and that consumers will at all times have control over their

17  money. Remsberg calls Meracord "an objective third party processor" on her blog. These

18  statements are false. In fact, Meracord is deeply intertwined with, and actively conspires with,

19  the Front DSCs. For most of the Front DSCs, Meracord provides software through which

20  consumers view their account balances and have the ability to "approve or decline" settlement

21  agreements with their creditors – if any are actually ever reached. This software in many cases

22  represents the bulk of the "services" that the Front DSC actually provides.

23      4.    Despite its statements to the contrary, Meracord does not act as an independent

24  fiduciary. Together with its network of Front DSCs, it loots customers' escrow accounts by

25  withdrawing exorbitant and abusive fees pursuant to debt settlement contracts that are wholly

26

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 2
Case No. 12-cv-05657-BHS
010262-13 561082 V1



HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

fraudulent because they are obtained by means of false representations, including guarantees about consumers' debts being settled for "pennies on the dollar," misleading statements about the success rates of the debt settlement services, and assurances that Meracord – the entity actually withdrawing funds from consumers' accounts – is an "independent" third party. The contracts entered into and fees charged by Meracord and the Front DSCs are illegal under the Washington Debt Adjusting Act and Washington Consumer Protection Act, which strictly regulate the total fees that can be charged by debt adjusters and prohibit the fraudulent practices alleged below. In many cases, as a result of the exorbitant fees charged, it is impossible for the consumer to ever accumulate sufficient funds for his or her debts to be settled as promised.

5.     If consumers discover the fraud and attempt to retrieve the illegally extracted fees, they often find that the Front DSC is completely unresponsive, or, worse, is nothing more than a shell entity with no real address and no discernible ownership structure. Meracord, for its part, stonewalls customers and refuses to refund illegal fees, hiding behind false claims that it "only" provides "payment processing" services; that it is "not a debt settlement company;" and that it is wholly "independent" from the suddenly unavailable (or vanishing) Front DSCs. By the time Meracord actually closes the account, the consumer will have lost thousands, and in some cases tens of thousands, of dollars in unlawful charges.

6.     Meracord's debt settlement account "churn" rate (cancelled accounts as a percentage of active accounts) approaches 70% – a clear and objective indication that the vast majority of its business activity is wholly fraudulent. If Front DSCs were actually performing debt settlement services, the vast majority of their consumers would not cancel their accounts before their debts were extinguished. This telltale high "churn" rate is well known to Remsberg.

7.     Meracord's claim that it is not a debt settlement or "debt adjusting" company is particularly outrageous, since, as explained below, it clearly met the statutory definition for such companies during the relevant time period for this complaint. Moreover, the online account

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 3
Case No. 12-cv-05657-BHS
010262-13 561082 V1

HB HAGENS BERMAN

1918 Eighth Avenue, Suite 3300 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1   management tool that Meracord provides for customers specifically has a section entitled

2   "Settlements," where customers can "get more details about [pending settlement agreements]

3   and . . . approve or decline the proposed agreement[s]."

4       8.    Plaintiffs' experiences are typical of the harm suffered by victims of Meracord and

5   it's co-conspirators. All three plaintiffs were in financial distress, and all were fraudulently

6   induced to sign up for "debt settlement services" that they believed would help them to finally

7   dig themselves out of debt. As part of its "services," Meracord withdrew tens of thousands of

8   dollars from Plaintiffs' bank accounts, which Plaintiffs believed were being saved in order to be

9   put towards the "settlements" that would be negotiated with their creditors. When Plaintiffs

10   realized that nothing was actually being done to negotiate settlements, it was too late. Meracord

11   had already taken exorbitant fees for itself and the Front DSCs out of Plaintiffs' "debt settlement

12   accounts," and when Plaintiffs demanded that their money be returned, they faced either

13   stonewalling by Meracord and the Front DSCs or, in one case, threats that the Front DSC would

14   *sue the Plaintiff* for demanding her money back. All three Plaintiffs ultimately lost thousands of

15   dollars to Meracord and the Front DSCs, and ended up even *more* in debt than they were when

16   they originally sought help.

17       9.    Plaintiffs bring this action pursuant to the Racketeering Influenced and Corrupt

18   Organizations Act ("RICO") and Washington state law, to remedy Meracord's illegal conduct.

19   Plaintiffs bring this action on behalf of themselves and a Class consisting of all persons in the

20   United States who established an account with Defendant Meracord LLC ( or its predecessors or

21   subsidiaries) from which Meracord processed any payments related to any debt settlement

22   program.

23       10.    Meracord acted – and continues to act – in concert with the Front DSCs, including

24   Lloyd Ward Defendants discussed below, to perpetuate an unfair, deceptive, and fraudulent

25   business scheme injurious to consumers and in violation of RICO; Washington's debt adjusting

26

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 4
Case No. 12-cv-05657-BHS
010262-13 561082 V1

statute, WASH. REV. CODE § 18.28; the Washington Consumer Protection Act, WASH. REV. CODE § 19.86; and the common law of Washington State.

## II.   JURISDICTION AND VENUE

11.   This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2). Based on information and belief, the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interest and is a class action composed of more than 100 members and in which at least one Class member is a citizen of a state different from that of Defendants. This Court has jurisdiction over the RICO claim pursuant to the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(c) (civil remedies for RICO violations). This Court has pendant jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

12.   Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the events that gave rise to the claims occurred in substantial part in this judicial district. Meracord is headquartered in this district and the racketeering enterprise alleged is centered in Tacoma, Washington. In addition, the Terms and Conditions signed by Plaintiffs Hewson and Johnson-Peredo (and, on information and belief by Plaintiff Canada and all putative Class members) expressly state that "[a]ny and all legal action" against Meracord "must be transacted or brought *in a court* located in the State of Washington." (Emphasis added.) As a result, Meracord cannot attempt to compel arbitration of this action based on dubious arbitration clauses used by many of its Front DSCs.

13.   This Court has personal jurisdiction over Meracord because its principal place of business is Tacoma, Washington, which is also where it is headquartered. In addition, the Terms and Conditions signed by Plaintiffs Hewson and Johnson-Peredo expressly state that "[a]ny and all legal action" against Meracord "must be transacted or brought in a court located in the State of Washington."

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 5
Case No. 12-cv-05657-BHS
010262-13 561082 V1



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

14.   This Court has personal jurisdiction over Linda Remsberg because Remsberg has controlled and directed the affairs of Meracord and the Meracord Enterprise described below from Meracord's headquarters in Tacoma, Washington and because, on information and belief, Remsberg resides in this district.

15.   This Court has personal jurisdiction over each of Lloyd Ward Defendants pursuant to 18 U.S.C. § 1965(b) since Lloyd Ward Defendants participated in the conduct of the Meracord Enterprise and the claims against Lloyd Ward Defendants arise, in part, out of their business transactions with Meracord, a Washington-based company. This Court also has jurisdiction over Lloyd Ward Defendants pursuant to RCW § 19.86.160, since Lloyd Ward Defendants together engaged in violations of RCW § 19.86 which had an impact on the state of Washington. Specifically, Lloyd Ward Defendants have actively participated in the Meracord Enterprise and conspired with Meracord with the intent and effect of defrauding consumers nationwide, including hundreds if not thousands of consumers located in this district.

16.   In addition, this Court has personal jurisdiction over Lloyd Ward Defendants because Lloyd Ward Defendants "purposefully avail[ed] [themselves] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1077 (9th Cir. Cal. 2011) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S. Ct. 1228, 2 L. Ed. 2d 1283 (1958)).

17.   Lloyd Ward Defendants intentionally and knowingly solicited Washington State residents for their wholly fraudulent debt settlement services by means of the internet, telephone solicitations across state lines, and emails. For example, Lloyd Ward Defendants solicited Washington State residents Sherrie Kay Gordon and Debbie Kay Miller for their wholly fraudulent debt settlement services. These transactions are the subject of another lawsuit currently pending in Washington State Superior Court. *Gordon, et al. v. Lloyd Ward, et al*., No 12201551-6 (Filed April 23, 2012).

HB HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

### III.   PARTIES

**A.   Plaintiffs**

18.   Plaintiff Marie Johnson-Peredo is a Pennsylvania resident. Ms. Johnson-Peredo signed up for the debt settlement services of Meracord and Lloyd Ward Defendants. As a result, she was defrauded of thousands of dollars by Meracord and its co-conspirators and accomplices.

19.   Plaintiff Robert Hewson is a Pennsylvania resident. Mr. Hewson signed up for debt settlement services of Meracord and a member of Meracord's Front DSC network. As a result, he was defrauded of thousands of dollars by Meracord and its co-conspirators and accomplices.

20.   Plaintiff Dinah Canada is an Illinois resident. Ms. Canada signed up for the debt settlement services of Meracord and a member of Meracord's Front DSC network. As a result, she was defrauded of thousands of dollars by Meracord and its co-conspirators and accomplices.

**B.   Defendants**

**1.   Meracord Defendants**

21.   Defendant Meracord, LLC ("Meracord") is a Delaware limited liability company with its principal place of business in Tacoma, Washington. According to its Sign-Up Agreement, Meracord "is in the business of providing transaction management and processing services and certain related services as an independent third party," and its website touts its aim "to be the most respected 3rd party payment service provider in the world, where there is a written promise that dictates the responsible and accurate treatment of the payment."

22.   Defendant Meracord was formerly known as NoteWorld. After a number of class action lawsuits were filed against NoteWorld, the company changed its name to Meracord. Frequent name changes are a common tactic in the debt settlement industry. By changing names, companies in the debt settlement industry are able to wipe clean their online reputations virtually overnight, making it more difficult for consumers to associate the company with the lawsuits and

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 7
Case No. 12-cv-05657-BHS
010262-13  561082 V1



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

other negative consumer feedback. In this Complaint, Plaintiffs refer to "Meracord," although most of the events described herein took place when the company was called "NoteWorld."

23.    Defendant Meracord has conspired and/or currently conspires with scores (if not hundreds) of front-end debt settlement companies ("Front DSCs"), who together with Meracord compose the Meracord Enterprise. Those Front DSCs include at least the following entities: Lloyd Ward and Associates, Express Debt Settlement Holdings, Law Office of Simon & Bocksch, Freedom Debt Relief, First Rate Debt Solutions, Expert Settlement Professional, P&E Solutions, Freedom Debt Center, Accredited Financial Corporation, Amber Network Inc., Best Debt Options, Beyond Financial Service, Brite Credit Inc. (d/b/a Brite Credit 123), Century Negotiations Inc., Clear Debt Solution, Coastal Debt Solutions LLC, Consumerwise Debt Solutions Inc., Counsel 4 Debt Relief, Countrywide Debt Solutions Inc., Credit Care Corporation, CreditCare Pro, Debt Help Center USA, Debt National Relief, Debt Reinvestment, Debt Solutions, Debt Erase Inc., DebtPointer Inc., DebtPro LLC, DTS Financial Group, E.A.C. Financial LLC, FBL Associates, Freedom Debt Solutions, Help Settle LLC, Helpsettle.com, Innovative Debt Solutions, Lifeguard Financial, Maximum Debt Solutions, Morgan Stevens Financial Solutions Company, National Financial Freedom LLC, Nationwide Consumer Advocacy Group, On Track Financial LLC, Personal Debt Systems of America, Princeton Debt Management LLC, Reduce My Debt LLC, Settle A Debt Inc., Settlement Corporation of America, SilverLeaf Debt Solutions, The Debt Answer, The Debt Cure, US Consumer Report, Vision Debt.com and World Debt Solutions. Many of these Front DSCs have been the subject of state and federal investigations for consumer fraud.

24.    Defendant Linda Remsberg ("Remsberg") is the Owner, President, and CEO of Defendant Meracord. Remsberg acquired Meracord in 2007, having worked for the company for approximately nine years prior to that, primarily in the company's Seller Finance business unit. As President/CEO, Remsberg oversaw the creation of Meracord's Debt Settlement business unit,



1    which now generates over 70% of the company's revenues. Remsberg oversaw the creation of

2    the Meracord Enterprise and, in conjunction with the principals and owners of the Front DSC's

3    described above, Remsberg continues to conduct and/or participate in the conduct of the

4    Meracord Enterprise's unlawful activities.

5        25.    Remsberg maintains an official blog on the Meracord website that disingenuously

6    touts Meracord's purported belief in "consumer protection." Examples of Remsberg's blatantly

7    false and misleading descriptions of Meracord and its business practices include:

8             (a)    "We always do things right;"

9             (b)    "We build trust by being trustworthy;"

10            (c)    "We care about the people's lives we touch;" and

11            (d)    "We lead transparently."

12       None of these things are true. The truth is that after being purchased by Remsberg,

13    Meracord was transformed from a company whose business was devoted almost exclusively to

14    processing payments for private mortgages into a company whose major business involves

15    preying on financially vulnerable consumers by creating the mechanism by which scores of

16    dubious "debt-settlement" companies can easily obtain direct payments from victims' bank

17    accounts. In that manner, Meracord deliberately supports, facilitates and participates in the

18    criminal conduct described below.

19        26.    Defendant Charles Remsberg is a resident of Washington and the spouse of

20    Defendant Linda Remsberg. At all times, Defendant Linda Remsberg was acting on behalf of her

21    marital community with Defendant Charles Remsberg with respect to the misconduct alleged

22    herein.

23        **2.**      **Lloyd Ward Defendants**

24        27.    Defendant Lloyd E. Ward ("Ward") is an attorney licensed to practice in the state of

25    Texas. He owns and/or controls a byzantine web of corporate entities. These entities include

26

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 9
Case No. 12-cv-05657-BHS
010262-13 561082 V1



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

those listed below, all of which, upon information and belief, operate in association with (or under the name) "Lloyd Ward & Associates." According to its website, LWA is a law firm established in 1992 and located in Dallas, Texas. In addition to other practice areas, the firm publicizes a Debt Settlement practice and touts its "relationships with creditors" who "realize that we are working as diligently as they are to negotiate a debt settlement and remove it from their books." LWA's website falsely advertises that its debt negotiation service is "guaranteed in writing to work or your fees will be returned!" At all times, Lloyd Ward was acting on behalf of his marital community with Amanda Glen Ward with respect to the misconduct alleged herein

28. Defendant Amanda Glen Ward is a resident of Texas, the spouse of Lloyd Ward, and the Director of Marketing for LWA and its associated entities. Amanda Ward has the authority to handle and disburse the funds, described below, received by Lloyd Ward Defendants from the Meracord Enterprise. Amanda Ward has participated in, ratified or aided and/or abetted all the unlawful practices alleged herein to have been committed by Lloyd Ward Defendants. Specifically, she has directed and/or participated in the fraudulent solicitation of class members and the transmission over interstate lines of unlawfully obtained funds. In addition, Defendant Amanda Ward has permitted her family trust, the Glen Family Trust, to be used to hide her and her husband's ill-gotten gains. At all times, Amanda Ward was acting on behalf of her marital community with Lloyd Ward with respect to the misconduct alleged herein.

29. Defendant Lloyd Ward, P.C. is a Texas professional corporation located in Dallas, Texas. Ward serves as the sole Director, President, and registered agent for Lloyd Ward, P.C. Upon information and belief, Lloyd Ward, P.C. also does business as Lloyd Ward Group, LLC.

30. Defendant Lloyd Ward & Associates, P.C. is a Texas professional corporation located in Dallas, Texas. The registered agent for Lloyd Ward & Associates, P.C. is Lloyd Ward, P.C., with both entities using identical addresses. Ward serves as President of Lloyd Ward &

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 10
Case No. 12-cv-05657-BHS
010262-13 561082 V1

HB HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Associates, P.C. Upon information and belief, Lloyd Ward & Associates P.C. also does business as Lloyd Ward Group, LLC.

31.  Defendant The Lloyd Ward Group, P.C. is a Texas professional corporation located in Dallas, Texas. Defendant Lloyd Ward, P.C. serves as the company's registered agent, and Ward serves as CEO, Director, and President of The Lloyd Ward Group, P.C. The Lloyd Ward Group, P.C. also operates under the assumed name Lloyd Ward Group II. The certificate of formation states that its purpose is to engage in "legal services and other services ancillary thereto." Even though The Lloyd Ward Group PC is a law firm purportedly engaged in the practice of law, it shares profits with a non-lawyer. Specifically, it is 42.5% owned by Kevin Devoto, 42.5% owned by Lloyd Regner and 15% owned by Lloyd Ward. Mr. Devoto is a convicted felon who served 18 months for his involvement in a prior fraud and is currently subject to a $2,185,476.29 restitution order. Neither Mr. Regner nor Mr. Devoto are licensed attorneys in Texas, or, on information and belief, in any other state.

32.  Ward Holdings, Inc. is a Texas corporation located in Dallas, Texas. Ward serves as the company's registered agent, President and Director. The company's charter was involuntarily forfeited in February 2012 for failure to comply with the Texas Tax Code.

33.  Defendant Settlement Compliance Commission Inc. is a Texas corporation located in Dallas, TX. Defendant Lloyd Ward & Associates, P.C. serves as the company's registered agent, and both companies are located at the same Dallas address. Ward serves as a Director of the company, along with two other individuals: Mike Miles and Chris Garrison. Mr. Miles also serves as the Manager of SilverLeaf Debt Solutions, LLC, one of the other entities that was involved in Plaintiff Marie Johnson-Peredo's Meracord transactions. The relationship between Ward and Mr. Miles/SilverLeaf served as the basis for a disciplinary petition brought by the State Bar of Texas against Ward for various violations of the Texas Rules of Professional Conduct.

HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

34. Collectively, Lloyd Ward, Amanda Ward and the Lloyd Ward entities described above are referred to below as LWA or Lloyd Ward Defendants. The above entities represent only some of the numerous entities created by Ward for his unlawful activity. Lloyd Ward Defendants constantly generate new entities in order to evade regulatory enforcement, avoid paying bills and escape litigation by and liability to their victims. As Lloyd Ward himself candidly explained in a September 2010 email to his business partner (and convicted felon) Kevin Devoto: "A new entity has certain advantages, as it is clean with no baggage or potential baggage (i.e. no chance of any suite [sic] for past issues). . . . I would strongly recommend we set up the new company as all of the existing companies have the potential for some type of litigation be it wages/labor law, employment claims, client claims, ect [sic] . . . ."

## IV.   FACTS

### C.   The Debt Settlement Industry

35. As the economy has declined in recent years, the number of Americans unable to pay their debts has increased, bringing a concurrent increase in the number of companies (both nonprofit and for-profit) offering to help consumers manage or eliminate those debts. Among those companies are those offering for-profit "debt settlement" services.

36. Debt settlement companies purport to assist consumers by acting as intermediaries between a consumer and his or her creditors, and charge fees to "negotiate" with creditors in the hopes of getting the creditors to settle for less than the full amount of the consumer's debt.

37. Typically debt settlement companies operate by requiring that a consumer agree to have a specific monthly payment automatically deducted from the consumer's account and sent into a specified bank account not under the consumer's direct control. The monthly payment is used to pay the company's fees, and the remaining amount goes towards accumulating money to

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 12
Case No. 12-cv-05657-BHS
010262-13 561082 V1



HB   HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1  provide a "lump sum" amount which the debt settlement company can use to negotiate with

2  creditors in order to lower the overall amount required to satisfy the consumer's debt.

3     38.   Individuals suffering from debt-related troubles may be among the most vulnerable

4  consumers, due to the inherent emotional stress of carrying seemingly insurmountable debt loads

5  – a stress compounded by the harassment suffered by many debtors at the hands of collection

6  agencies. Despite the passage of the Fair Debt Collection Practices Act, many collectors continue

7  to subject indebted consumers to a deluge of harassing and harrowing phone calls and letters

8  demanding payment of debts and threatening dire consequences, resulting in an increasing sense

9  of desperation experienced by many debtors. Add to this emotionally charged setting a debt

10  settlement company promising to "make it all go away," and an environment rife with fraud and

11  consumer exploitation emerges.

12     39.   Indeed, many states, along with multiple federal government agencies and consumer

13  advocates, have recognized the rampant abuses taking place in the debt settlement industry, and

14  have taken steps to curb such abuses.

15     40.   Recently, the Federal Trade Commission ("FTC") responded to industry practice by

16  issuing new regulations prohibiting the very practices described herein, which include charging

17  advance fees for debt settlement services, as well as misrepresenting the nature and details of the

18  services to be provided. In describing the rationale for its advance fee ban, the FTC noted:

19  "Consumers in the midst of financial distress suffer monetary harm – often in the hundreds or

20  thousands of dollars – when, following sales pitches frequently characterized by high pressure

21  and deception, they use their scarce funds to pay in advance for promised results that, in most

22  cases, never materialize." FTC Telemarketing Sales Rule, 75 Fed. Reg. 153, 48482 (August 10,

23  2010).

24     41.   In 2010, the Government Accountability Office ("GAO") issued a report on the for-

25  profit debt settlement industry. Bearing the illustrative title "DEBT SETTLEMENT: Abusive,

26

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 13
Case No. 12-cv-05657-BHS
010262-13 561082 V1



HB  HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

and Deceptive Practices Pose Risk to Consumers," the report outlined the GAO's investigation of 20 debt settlement companies, in which GAO staff members had posed as indebted consumers. The GAO "found the experiences of its fictitious consumers to be consistent with widespread complaints and charges made by federal and state investigators on behalf of real consumers against debt settlement companies engaged in fraudulent, abusive, or deceptive practices."

42.     In Washington State, the legislature's concern about abusive practices in the debt settlement industry led it to pass an act placing strict limitations and requirements on entities involved in "debt adjusting."[1] The Washington Supreme Court held in 2011 that "debt adjusters" under the statute clearly included "payment processors" such as Meracord. In making that determination, the court briefly reviewed the legislative history of the Act, noting that it "reveal[ed] a deep-seated concern about the abuses inherent in the debt adjusting industry," abuses that the legislature found stemming from "[t]he lack of industry regulation, and the frequently unsophisticated and/or desperate client seeking relief from bill collectors' harassment." *Carlsen v. Global Client Solutions, LLC*, 171 Wn.2d 486, 495 (2011).[2]

D.     **The Meracord Enterprise**

43.     In order to vastly grow its customer base, while shielding itself from the scrutiny and complaints of those it defrauds, Meracord – at the direction of Defendant Linda Remsberg – partners with an elaborate network of Front DSCs. Meracord uses the Front DSC network to sign

---

[1] Though the statute does not itself contain an official short title, for ease of reference it is referred to hereinafter as the Washington Debt Adjusting Act, or "DAA."

[2] In March 2012, the Washington State Legislature amended the DAA, creating a new statutory category for entities like Meracord called "third-party account administrators" ("TPAAs"). Under the amended statute, TPAAs are not considered "debt adjusters," but continue to have their own set of responsibilities to consumers, including fee limitations, disclosure requirements, and restrictions on the handling of consumer funds. These amendments were not effective until June 7, 2012, and do not apply retroactively. Thus, the amendments to the DAA provide no shield to Meracord for the violations of Washington and federal law alleged in this Complaint.

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 14
Case No. 12-cv-05657-BHS
010262-13  561082 V1

HB   HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

up desperate and unsuspecting consumers who are looking for relief from the overwhelming stress of their indebtedness.

44.   Typically, a consumer will sign up with a Front DSC representing itself as a single company engaged in the business of debt settlement. Front DSCs seek customers through unsolicited phone calls, email, or mail, as well as internet, television and radio advertising claiming to offer relief for consumers saddled with overwhelming debt.

45.   Only later, if ever, does the consumer discover that there are multiple companies involved in the process. The relationships between the various companies are purposefully obscured to prevent the consumer from disentangling the complicated scheme.

46.   With Meracord's and Remsberg's knowledge and approval, its Front DSCs uniformly and falsely represent to the consumer that Meracord is an independent, unbiased "payment processing" company. Meracord itself and Remsberg herself affirm these misrepresentations and uniformly and falsely hold Meracord out to consumers as completely "independent" from its Front DSCs and as "objective." In fact, there exist close relationships between Meracord and its network of Front DSCs:

> (a)   Meracord promotes, establishes, maintains, and manages debt settlement accounts on behalf of consumers as an integral component of debt settlement programs marketed by its Front DSCs, including Lloyd Ward Defendants;
>
> (b)   Meracord invites select Front DSC's to join its "VIP Club" and provides these Front DSC's with free industry research and free analyses of their "consumer portfolio[s];"
>
> (c)   Meracord treats major debt relief sales channels to VIP events;
>
> (d)   Meracord provides the software through which customers enrolled by the Front DSCs monitor their escrow accounts and approve creditor settlements – in the relatively rare circumstances that such settlements actually occur;

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 15
Case No. 12-cv-05657-BHS
010262-13 561082 V1

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

(e)    Meracord's profits are dependent on increasing the number of debt settlement customers signed up by the Front DSCs because each such customer is also *required* to sign-up for Meracord's services;

(f)    Despite Meracord's express representation that the Front DSCs do not act as its "agents," the Front DSCs act under Meracord's direction and control when they provide customers with "Sign-Up Agreements" on its behalf;

(g)    Despite Meracord's express representation that it does not act as an "agent" for its Front DSCs, Meracord in fact processes automatic withdrawals from customer bank accounts and distributes unlawful debt settlement fees back to the Front DSCs – all supposedly pursuant to dubious "agreements" between the Front DSCs and customers and, upon information and belief, according to express agreements between Meracord and the Front DSCs;

(h)    Meracord is deeply intertwined with the Front DSCs. Remsberg, on behalf of Meracord, often attends debt settlement industry events, where she serves on panels alongside representatives of the Front DSCs, and, upon information and belief, describes Meracord and the Front DSCs as engaged in the joint endeavor of recruiting debt settlement customers.

(i)    For example, in April 2011, Remsberg attended a conference of The Association of Settlement Companies ("TASC," which shortly thereafter changed its name to the American Fair Credit Council). At the TASC conference, Remsberg served on a panel with four other panelists – all four of whom represented Front DSCs. One of the panelists was Andrew Housser, CEO of Freedom Debt Relief, a Front DSC involved in the scam that injured Plaintiff Dinah Canada, and which at the time had already been investigated by the Washington State Attorney General's office for

HB  HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

violations of Washington consumer protection laws (discussed in further detail below).

 (ii) During the panel discussion at the TASC conference, on information and belief, Remsberg referred to her company and the Front DSCs as part of a joint endeavor, saying that "[our customers] feel *we* are better at negotiating than they are. That's why they sign up with *us*," and advising that business success for the endeavor depends on "who *we* are enrolling" and "how fast are *we* delivering results." (Emphasis added.)

47. The standardized contracts provided to consumers by the Front DSCs contain, at the very least, an agreement for debt settlement services as well as a Meracord "Sign-Up Agreement," and often contain a myriad of other confusingly worded forms.

48. The debt settlement programs provided for by these agreements universally involve the following material elements:

 (a) The consumer agrees to pay specified debt settlement fees that, unbeknownst to the consumer, are illegal and *per se* unfair, but generate large profits for the Meracord Enterprise;

 (b) In addition to the debt settlement fees, Meracord charges the consumer unlawful fees to maintain and manage the trust account necessary for the operation of the debt settlement program;

 (c) The debt settlement account is established for the purported purpose of accumulating funds with which to pay the settlements ostensibly to be negotiated by the Front DSCs;

 (d) Meracord is authorized to automatically transfer periodic (usually monthly) payments from the consumer's personal bank account into the debt settlement account;

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 17
Case No. 12-cv-05657-BHS
010262-13 561082 V1



HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

(e)     The program's success and the consumer's ability to financially afford the monthly debt settlement program payments generally presupposes that the consumer does not make further payments of his/her own on the outstanding and now further defaulting debt;

(f)     Meracord is also authorized to automatically and periodically debit the debt settlement account to pay the exorbitant debt settlement fees specified in the debt settlement agreement and "Sign-Up Agreement;"

(g)     The fees usually entirely consume consumers' monthly debt settlement payments for the first months, if not years, of participation in the program, and substantially consume consumers' monthly payments for the remainder of the debt settlement program;

(h)     In almost all cases, the consumer would be far better off simply directing the monthly payments to his/her creditors directly, thereby saving the fees illegally, unfairly and deceptively extracted by the Meracord Enterprise, and preventing the further accumulation of compounded interest.

49.     The contracts used by the Front DSCs, in addition to charging illegal fees, contain false, misleading, and illegal statements. For example, the contracts, along with the claims made by the Front DSCs' salespeople, often

(a)     Mislead customers into thinking that the debt settlement process will be handled by attorneys, or are "backed by" law firms;

(b)     Fail to disclose with appropriate specificity the nature of the fees to be charged and when such fees will be incurred;

(c)     Make false and/or misleading claims about the "success rates" of the programs;

(d)     Make false and/or misleading statements about the length of time it will take to complete the program;

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 18
Case No. 12-cv-05657-BHS
010262-13  561082 V1

HB  HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

(e) Make false or misleading promises about the percentage of the customer's debt that the company will be able to settle; and

(f) Make false or misleading statements about the factors that affect the customer's credit score and the impact of the debt settlement program on that score.

50. Moreover, the Front DSCs' salespeople often pressure consumers into signing (or "e-signing") the contracts quickly, without any meaningful opportunity to review the terms; and for their part, the contract terms are often so confusingly worded as to be unintelligible to the average consumer.

51. Meracord Defendants know that the contracts used by its Front DSCs are fraudulent and illegal, but Meracord still continues to process payments according to the terms of those contracts. Meracord Defendants' knowledge is self-evident, as

(a) Meracord processes payments pursuant to the contracts used by its Front DSCs, giving it direct knowledge of the fraudulent and illegal nature of those contracts;

(b) Meracord has produced copies of the contracts in this litigation demonstrating that it has the unlawful contracts in its possession;

(c) Meracord Defendants – as well as Lloyd Ward Defendants – are acutely aware of the enormous volume of consumer complaints regarding these fraudulent contracts and the false claims made to enroll consumers in debt settlement programs offered by the Meracord Enterprise. There are scores, if not hundreds, of consumer complaints on the Internet involving the scheme perpetrated by Meracord and its Front DSCs, including Lloyd Ward Defendants; and

(d) Meracord's debt settlement "payment processing" business is characterized by astronomically high churn rates (canceled accounts as a percentage of active accounts). Meracord has internally determined that its churn rates invariably

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 19
Case No. 12-cv-05657-BHS
010262-13 561082 V1


1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

exceed 60% and on occasion have exceeded 70%. Remsberg is aware of these high churn rates, which are symptomatic of and thus reveal widespread fraud;

(e)   Meracord is aware of regulatory enforcement actions against Front DSC's with whom it does business, yet it takes no steps to cease doing business with these Front DSCs. To the contrary, it often unlawfully facilitates the transfer of accounts from Front DSC's under investigation to new or other Front DSCs under common control in order to evade regulatory action.

52.   Front DSCs tout their association with Meracord as proof of their *bona fides* and to convince consumers that they are legitimate providers of debt relief services.

53.   The following are just a few examples of the complaints that consumers have posted on the Internet:[3]

(a)   "I am in a terrible debt situation, I used [Meracord] to help me get my debt collection off my back giving them $240.00 a month, now my situation has grown worst, and have paid them $480.00 I can't keep my payments up with [Meracord], I never got any thing done from them and I asked for a refund and they said no, I felt like all my money went into helping my self get out of debt and now they have made it impossible for me to pay anybody now I am in a rut. Why can't I get some of it back, not even $5.00 and they no longer want to help me. I just know that my creditors are still calling and I don't know what to do."

(b)   "[Meracord] is doing business with Lloyd Ward Law Firm. Lloyd Ward Law Firm was suppose to settle my debt and 2 months have gone by and they have not settled any debts. Therefore, they breached their contract. [Meracord] does business with them (I believe they are run by the same person/people. They say they are an "independent" company). They made 2 deductions from my account

---

[3]   The complaints are reproduced verbatim, including grammatical and spelling errors.

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 20
Case No. 12-cv-05657-BHS
010262-13 561082 V1



HB HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1  and refuses to give the money back stating fees for services by LLoyd Ward.

2  They didn't do anything for me as contracted. Yet, [Meracord] is refusing to

3  refund the money. How independent is that? Just because you have a seperate

4  Federal ID number, doesn't mean you aren't owned by the same people.

5  However, I will be filing complaints against both companies. DO NOT DO

6  ANY BUSINESS WITH LLOYD WARD LAW FIRM OR [MERACORD].

7  THERE IS DISHONESTY BY BOTH. RESEARCH THEM ON THE NET.

8  YOU FIND THERE ARE THE SAME TYPES OF COMPLAINTS AGAINST

9  BOTH."

10 (c)  "I went to [Meracord] for help on lowering interest on credit cards and they

11      started taking money out of my account every month in the amount of $376.38

12      and referred me to another company named attorney at law associates Lloyd

13      ward firm for help on the credit cards. The Lloyd ward customers services

14      employees don't want to get in touch with the creditors over the phones, their

15      way is over the mailing letters instead and not talking for the clients and keep

16      taking my money of $376.38. I joined them in March the [Meracord] and the

17      Lloyd wards for help. The account collected from me about three grand already

18      and I just closed it on October 27, 2010 because the Lloyd wards and

19      [Meracord] were taking my money and not helping us. . . . I tried to file a

20      complaint online with the better business bureau and they want so much

21      information, the money was being debit monthly out of my account. Why do I

22      have to prove how crooked these companies are."

23 (d)  "This Company is a big Scam and I think a class action law suite should be

24      started even if it take years to finish. I encouraged my mother and mother-in-

25      law to enroll and place my name as a contact to assist with both accounts. Me

26

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 21
Case No. 12-cv-05657-BHS
010262-13  561082 V1



HB  HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1 and my wife were providing financial support with the accounts, which my

2 mother-in-law suddenly died last month and the company has had us fax

3 documents as proof. We have sent death certificate, and power of attorney, but

4 the company request q new document everytime because they don't want to

5 release the money that's sitting in the trust account. Since the company appears

6 to be a scam, I had my mother to cancel her account and all they refunded was

7 $600 and paid off 1 debt in over a year after I provided a $216 payment to her

8 for lloydward/[Meracord] every month.The second debt they claim to be paying

9 an arrangement with has yet to receive the two $184 payments they claim to

10 have paid. After all this, we didn't discover the lies until my wife contacted

11 them that her mother died and requested the funds that were in the trust

12 account. Currently we are seeking an attorney to persue the lloydward firm for

13 the mental anquish they are creating for my wife. At this point it's not the small

14 amount of money, but it's the principal that they are scamming many people

15 including the disabled elderly."

16 (e) "Three years ago, I contracted the services of Clear Debt Solution to negotiate

17 and reduce my credit card debt. Per the agreement, I made monthly payments to

18 a third-party account for use in the debt settlement. Over $3000 was collected

19 up front by CDS and [Meracord] Service Center, the party in control of my

20 account. At the end of the program, for which I had contributed $317 per month

21 for over two years, only one account was settled by CDS. When a second

22 creditor sued, CDS did not respond to my requests for information in a timely

23 manner. After I lost the suit, my account was wiped out, plus I had to pay more,

24 to pay the court-ordered settlement. Three accounts remained unsettled. As I

25 had made no payments nor attempts to communicate with the credit card

26

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 22
Case No. 12-cv-05657-BHS
010262-13 561082 V1



HB   HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1   companies, per my agreement with CDS, each balance had doubled over the

2   two years. As I see it, these people made $3000 and I became deeper in debt

3   than when I started."

4   (f)   "Lifeguard Financial is a fraud. They make claims that they can settle your debt

5   for 50 cents on the dollar of your debt. They claim that they neogiate your debt

6   with your creditors, a lie. The client does all the work contacting the creditors

7   that Lifeguard is handling the clients debt. Lifeguard takes monthly payments

8   from your checking account through a escrow agent, namely [Meracord]. The

9   problem is most of all of your payments through [Meracord] go back to

10   Lifeguard Financial as fees leaving little funds to accumulate to go towards the

11   settlement with the creditors. I was in this program almost a year and found that

12   little amount of my monthly payments were accumulating towards settlement.

13   In another instance, I was threated with a lawsuit from one of my creditors, I

14   was told by their legal department to respond to the court clerk sending me

15   notice of the potential lawsuit which I also had to copy to the plaintiffs

16   attorneys. Lifeguard is of no help. In additon the creditors explained to me that

17   they refuse to deal with Lifeguard Financial. So what does that tell you. I will

18   file a complaint with Florida's attorney general. I don't think that contacting

19   BBB will get anywhere. I cancelled my contract with Lifeguard Financial and

20   expected a cordial converstation and that they will refund of my monies that I

21   paid them. Instead I got this "pitbull" whose name is "Robert" on the telephone

22   that started screaming at me about cancelling the contract with threats of suing

23   me. I ended up screaming back at him, needless to say at this point I out several

24   thousand dollars. If there is a class action suit, I want to be part of it."

25

26

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 23
Case No. 12-cv-05657-BHS
010262-13  561082 V1

HB HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1

(g)     "Back in March of 2008 I entered into a contract for debt relief with ClearDebt

2       Results. I first spoke with a Robert Till, then a Patrick Schlosser, then I was

3       passed to James Callahan, then again to Tiffany Shrum, all who appear to no

4       longer work at this company. This company has taken $1300 dollars from me,

5       provided no service as they say they were going to and they have a comapny

6       called [Meracord] Service Center continue to take $100 a month directly out of

7       my check. I want answers as to why they aren't taking care of these credit

8       issues as they stated they would. None of these creditors have been paid and I

9       continue to get harrassing phone calls."

10      (h)     "On 09/16/09, I signed a contract with Covenant Debt Solutions to have them

11      settle my unsecured debt and credit card accounts. Covenant used the services

12      of [Meracord] Service Center to deduct monies from my checking account to

13      payoff my debt. [Meracord] began to deduct $535.74 on the 17th of each

14      month, beginning on 10/17/2009. The monthly deduction included $390.93 for

15      service fee, $14.50 for maintenance fee and $130.31 to be placed in my trust

16      account. It was very difficult to speak to Covenant's customer service

17      department and I decided to cancel their services on 11/30/09. I spoke with

18      "oscar" who stated my trust account funds would be mailed to me within 7-10

19      days and pursuant a phone call from Brian. I waited but no check was sent to

20      me. I phoned Brian who stated that he was not in charge of approving issuance

21      of any checks and that he would have a supervisor contact me. I never received

22      a phone call from a Covenant supervisor. To this date, no check has been

23      issued/received from Covenant or [Meracord]. I placed a stop payment with my

24      bank to prevent [Meracord] to continue taking my monies."

25

26

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 24
Case No. 12-cv-05657-BHS
010262-13  561082 V1

HB HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

54. Instead of investigating these complaints and refusing to do business with the unsavory Front DSCs, Meracord – at the direction of Remsberg – devotes its energy to posting false and misleading rebuttals to these complaints. These rebuttals falsely claim:

(a) That Meracord is not a debt settlement company, despite the fact that its actions clearly fall under the statutory definition for such companies during the relevant time period of this complaint;

(b) That Meracord "takes on the payment servicing obligations as an independent and objective company and does not act at the direction of the [debt settlement companies]," despite the fact that Meracord withdraws fees from customer payments *at the behest of* its Front DSCs and then provides those fees to the Front DSCs;

(c) That it is "not contracted with" its Front DSCs, despite the fact that, on information and belief, Meracord and its Front DSCs enter into contracts related to the debt settlement programs administered by both entities;

(d) That it "follows the instructions stated in the Meracord contract and at no time acts without authorization from the consumer," despite the fact that many times the contracts signed by consumers do not contain clear or specific schedules of when fees will be withdrawn, and thus Meracord's withdrawal of fees must necessarily be the result of separate (unilateral) instructions from the Front DSCs.

55. Meracord perpetuates the fraud by making false and misleading statements of its own through its website, emails and letters to customers, and the Sign-Up Agreements given to customers on behalf of Meracord by the Front DSCs – including Lloyd Ward Defendants. These statements include false assurances that customers are fully "in control" of their accounts, and that Meracord will not disburse any funds without the customer's permission, when in fact

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 25
Case No. 12-cv-05657-BHS
010262-13 561082 V1

HB  HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Meracord and its Front DSCs are in control of the debt settlement accounts, routinely disbursing money to themselves for unearned and illegal fees.

56.   Meracord also falsely claims that it is not a debt settlement or "debt adjusting" company, even though it meets the statutory definition for such companies, during the relevant time period of this complaint, since it is engaged in receiving funds for the purpose of distributing said funds among creditors in payment or partial payment of obligations of a debtor. Significantly, the online account management tool that Meracord provides ("MyPromise," formerly called "NoteWorld Reporter") has a section entitled "Settlements," where customers can "get more details about [pending settlement agreements] and . . . approve or decline the proposed agreement[s]."

57.   Customers who discover the fraudulent activities of the Meracord Enterprise find themselves fighting an uphill battle to disentangle the labyrinthine scheme and determine the party ultimately responsible for the scam. The ephemeral Front DSCs disappear, stop answering phone calls, disclaim responsibility, or resort to outright threats and intimidation; and Meracord also refuses to admit any responsibility for the fraud in which it was complicit. Indebted consumers are thus left in *worse* positions than if they had never sought help at all, having often paid thousands of dollars in exorbitant and illegal fees that could have gone towards reducing their debt loads.

58.   Remsberg and Meracord profit from the fees generated by each consumer enrolled by the Front DSC members of the Enterprise, knowing that the fees are generated by fraudulent and deceptive means, and knowing that often the fees charged are flatly illegal.

59.   The Front DSCs in the Meracord Enterprise include entities like Lloyd Ward Defendants, who have been the subject of multiple lawsuits and government investigations related to their debt settlement business:

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 26
Case No. 12-cv-05657-BHS
010262-13 561082 V1



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

(a)     A Kansas court found that Lloyd Ward Defendants' debt settlement practices violated the Kansas Consumer Protection Act and the Kansas Credit Services Organizations Act, harming the plaintiff in that case by causing a judgment to be entered against him and by causing him "considerable anguish, stress, and despair." The court awarded the plaintiff $100,000 in damages ($4,347.82 for each of the twenty-three deceptive acts in which Lloyd Ward Defendants engaged), in addition to attorneys' fees.

(b)     The Connecticut Department of Banking issued a Cease and Desist Order in September 2011, requiring Lloyd Ward Defendants to pay a $500,000 civil penalty for violations of Connecticut's statutory requirements for debt adjusters/negotiators. The violations included charging fees that the Department found to be "excessive" and engaging in debt negotiation without a license. The Department also required Lloyd Ward Defendants to specifically repay fees to a Connecticut resident who was charged excessive fees and "received no benefit" in return. When asked under oath in other litigation whether he intended to pay the fine issued by Connecticut, Ward blatantly stated, "No". On information and belief, to this date Ward has neither appealed nor paid this fine, despite the fact that the order requires payment within thirty days.

(c)     On July 29, 2010, the North Carolina Attorney General issued a cease and desist letter to the Lloyd Ward Defendants and required them to identify within ten days all North Carolina customers. On information and belief, Ward simply ignored this cease and desist letter.

(d)     In February 2012, a bankruptcy trustee in Ohio brought two lawsuits against Lloyd Ward Defendants on behalf of LWA customers who had entered bankruptcy. The suits alleged violations of the Ohio Debt Adjustment

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 27
Case No. 12-cv-05657-BHS
010262-13  561082 V1

HB  HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Companies Act, the Ohio Consumer Sales Practices Act, and Fraud. Among other things, the suits allege that "LWA is in the business of lending its name to debt settlement businesses . . . to create a fiction that the services are being performed by attorneys, thereby evading consumer protections applicable to such services, including fee limitations."

(e)  In April 2012, a class-action lawsuit was filed against Lloyd Ward Defendants in Washington State Superior Court, along with SilverLeaf Debt Solutions (another of the businesses involved in the scam that injured Plaintiff Marie Johnson-Peredo). The lawsuit alleges violations of the Washington Debt Adjusting Act and the Washington Consumer Protection Act, as well as breach of fiduciary duty, on behalf of Washington customers of Lloyd Ward Defendants.

60.   On information and belief, Lloyd Ward Defendants have received cease and desist letters from other states or state attorneys general, including West Virginia, and have ignored these inquiries.

61.   Ward is also personally the subject of an ongoing disciplinary petition filed by the Texas Commission for Lawyer Discipline, alleging six separate violations of the Texas Disciplinary Rules of Professional Conduct. The allegations revolve around Ward's interactions with SilverLeaf Debt Solutions.

62.   Lloyd Ward & Associates, P.C. currently has an "F" rating with the Better Business Bureau, based on dozens of complaints having been filed against the company in the last three years.

63.   Like Meracord, however, Lloyd Ward Defendants actively attempt to manage their online reputations. For example, when Defendant Amanda Ward discovered that negative comments were being posted on the website www.merchantcircle.com, she immediately emailed

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 28
Case No. 12-cv-05657-BHS
010262-13 561082 V1



HB HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Lloyd Ward and their business partner Kevin Devoto, writing on April 15, 2010: "This is what I was worried about!!!! We have no control over what people say and this is very bad. Can you not get us removed from this website?" In a response the same day, Mr. Devoto wrote as follows:

> The good news is:
>
> A. You can answer these.
>
> B. But even better, it seems pretty simple to just post enough good comments to simple [sic] drive any bad ones so for [sic] Down the list that no one can find them anyway.
>
> We just don't want any comment like that being left alone.
>
> FOR INSTANCE:
>
> I personally just posted the following:
>
> dear Lloyd Ward, pls tell Kervin tbat Kelly has just been incredible for us. We really had some challenges and it's looking like the light is appearing at the end of the tunnel. Thanks Lloyd Ward.

64.   On information and belief, neither Ward nor Defendant Amanda Ward objected to Devoto's posting of misleading comments falsely purporting to come from LWA customers, thereby ratifying the false and misleading postings.

65.   E-mail communications and Internet postings such as the one described above are examples of the use of the interstate wire facilities to continue and perpetuate the illicit goals of the criminal enterprise alleged herein.

66.   Lloyd Ward Defendants profit from the fees generated by fraudulently inducing consumers to sign up for their debt settlement "services," and profit from their association with the Meracord Enterprise by using Meracord to legitimize their services and by convincing consumers that their money will be safe in a Meracord account which only the consumer can control. In addition, because Meracord usually automatically deducts payments from the consumer's bank account, Lloyd Ward Defendants are more likely to reap illicit gains from consumers automatically after signing them up, as opposed to a system where consumers would later – after having reviewed and contemplated the "services" being offered – have to make a separate payment.

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 29
Case No. 12-cv-05657-BHS
010262-13 561082 V1



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

67.   The Front DSCs in the Meracord Enterprise also include companies such as Freedom Debt Relief, which has had 251 complaints filed with the Better Business Bureau in the last three years and been the subject of an investigation by the Washington Attorney General which resulted in a March 3, 2011 consent decree.

68.   The Washington State consent decree "stems from the Attorney General's claims that Freedom Debt Relief in some cases charged consumers more than the allowed 15 percent of the total enrolled debt, taking its fees before the time permitted and failing to adequately inform consumers about how the program worked violating Washington's debt adjusting act and consumer protection act." As a part of the consent decree, Freedom Debt Relief agreed to pay approximately $800,000 in restitution for Washington consumers, and was forbidden from contracting with new Washington customers without notifying the Attorney General's office.

69.   In order to thwart regulatory actions, evade detection and continue to victimize financially distressed consumers, the Front DSCs that are members of the Meracord Enterprise regularly enter into agreements between and among themselves to transfer "portfolios" of victims. For example, in late 2010, Front DSC 'The Debt Answer' faced numerous complaints and regulatory issues including an investigation by the Connecticut Department of Banking. Instead of complying with the law, The Debt Answer sold its portfolio of 3,407 "active" debt settlement victims to Ward on January 1, 2011. The Debt Answer itself had apparently earlier purchased an undisclosed number of these victims from another Front DSC, Simon & Bocksch – one of the Front DSCs involved in the scheme to defraud Plaintiff Dinah Canada, as described below.

70.   On information and belief, Meracord facilitates these fraudulent "portfolio" transfers by wiring the unlawful fees to the new entity without any authorization from the consumer account holders, who generally remain unaware that their accounts have been transferred. In fact, on at least several occasions, Meracord account representatives have recommended such

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 30
Case No. 12-cv-05657-BHS
010262-13  561082 V1



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1  transfers upon learning that a Front DSC has encountered legal issues and "is going to be closing

2  the doors." By facilitating – and in some cases recommending – these wholly fraudulent transfers

3  of "portfolios" of victims, Meracord ensures that its steady flow of unlawful fees continues.

4      71.   Attorney-run Front DSCs have a special role in the Meracord Enterprise. By

5  marketing themselves as law firms, they are perceived by consumers as more trustworthy.

6  Attorney Front DSCs like Lloyd Ward Defendants use this false perception in their recruitment

7  efforts.

8      72.   In addition, Attorney-run Front DSC members of the Meracord Enterprise, such as

9  Lloyd Ward Defendants, often permit the use of their names by other Front DSCs in return for a

10  cut of their ill-gotten gains. Indeed, LWA went so far as to have a formal "Affiliate Agreement,"

11  which expressly permitted affiliated Front DSCs to "use LWA and any images, likeness,

12  reference, web site and web site material belonging to LWA or other items developed by LWA

13  for purposes of marketing and advertising," in return for a substantial cut of the profits.

14      73.   In addition to gaining consumers' trust by affiliating with a law firm, non-attorney

15  Front DSC's often affiliate with an attorney-run Front DSC in order to evade regulations in states

16  that prohibit debt settlement. Such states often have exceptions for practicing attorneys, such that

17  by spuriously affiliating itself with a law firm, a non-attorney Front DSC may extend the period

18  during which it can avoid regulatory scrutiny. As a former employee of The Debt Answer

19  testified in other litigation: "The Debt Answer marketed to certain states while Lloyd Ward &

20  Associates was brought in to be able to get the states that we couldn't market in under The Debt

21  Answer."

22      74.   Front DSCs also coordinate and communicate directly with each other through the

23  formation of industry trade associations whose primary purpose is to spread misleading

24  information about the debt settlement industry and issue bogus "certifications" to Front DSCs.

25  Front DSCs then use these bogus certifications to convince consumers that their activities are

26

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 31
Case No. 12-cv-05657-BHS
010262-13 561082 V1



legitimate. The following is an actual Frequently Asked Question (FAQ) from the website of one of these bogus trade associations, the United States Organizations for Bankruptcy Alternatives, Inc.:

> **Why do the Debt Settlement Companies I am researching seem to all have failing grades with the Better Business Bureau (BBB)?**
>
> *In an unfortunate turn of events, the BBB recently implemented a new 'scoring model'. This scoring model dictates that certain industries be graded as a whole. Unfortunately in the case of debt settlement companies, this model is quite severe, and has any company, regardless of their best-practices operations or good track record, restricted from achieving any rating above C-, USOBA supports the theory behind the BBB; a consumer should have a resource to compare companies in any industry based on the company's merits alone. At this time, the BBB ratings of Debt Settlement companies tells a consumer little or nothing about a company's ethics or reputability. Several USOBA members and other Debt Settlement entities were asked to "give back" prestigious awards and achievements such as the BBB Accreditation and BBB Torch Award. Prior to the scoring model change, the companies were exemplary in the eyes of the BBB. If you wish to include the BBB in your research of a Debt Settlement provider, we suggest you look carefully at the complaint resolution and not the arbitrary score.*

75. As the above allegations make clear, the Front DSCs that are part of the Meracord Enterprise are directly connected to each other through bogus trade associations as well as the formal and informal agreements described above. Thus, the Meracord Enterprise involves relationships between Meracord and the individual Front DSCs as well as relationships between and among the Front DSCs themselves – all evidenced by both the participation of Meracord Enterprise members in industry-wide events and trade associations, as well as the formal and informal agreements made among those members.

76. The Meracord conspiracy is a classic hub-and-spoke conspiracy which also involves relationships between the various spokes. Meracord serves as the hub of the Meracord Enterprise, entering into bilateral relationships with each Front DSC, through which Meracord both directly engages in and facilitates the fraudulent and illegal activity of the Meracord Enterprise, as alleged herein. As discussed above, Meracord also causes and assists the various "spokes" – the Front DSCs – in communicating with and conspiring with each other, all for the

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 32
Case No. 12-cv-05657-BHS
010262-13  561082 V1



HB  HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1   common benefit of the Meracord Enterprise and to the common detriment of its victims, whose

2   accounts are involuntarily shifted from one dubious Front DSC to another, with Meracord's

3   indispensable assistance, in order to hinder regulatory protective actions. These relationships

4   between Front DSCs, many of which are facilitated by Meracord, benefit and advance the

5   Meracord Enterprise as a whole. Other relationships between the Front DSCs include their bogus

6   trade associations and countless conspiratorial interactions between such Front DSCs at various

7   debt settlement industry functions, including those attended and sponsored by Meracord.

8

9   **E.    Injury to Plaintiffs and the Class**

10          77.    The experiences of Plaintiffs Dinah Canada ("Dinah"), Robert Hewson ("Robert"),

11   and Marie Johnson-Peredo ("Marie") are illustrative of the Meracord Enterprise's use of

12   unscrupulous Front DSCs to recruit consumers for its fraudulent and unlawful debt settlement

13   services.

14          78.    All three Plaintiffs were struggling to pay off high-interest credit card debt. The Front

15   DSCs – including Lloyd Ward Defendants – recruited Plaintiffs by promising that they could

16   settle Plaintiffs' debts quickly and for amounts between forty and fifty percent of the amounts

17   owed. After Plaintiffs signed up with the Front DSCs, Meracord withdrew regular monthly

18   payments from Plaintiffs' bank accounts. After many months in the debt settlement programs,

19   none had received word of any settlement offers or successful settlements – and two Plaintiffs

20   had been sued by their creditors. In response to Plaintiffs' inquires, the Front DSCs either

21   disappeared completely or offered little if any information about the status of their "settlement"

22   efforts. Indeed, in Dinah's case, her attempts to inquire into the status of her account resulted in

23   the Front DSC threatening to sue her for "slander."

24          79.    With knowledge of the fraudulent nature of the contracts between Plaintiffs and the

25   Front DSCs, Meracord withdrew monthly payments from Plaintiffs' bank accounts and deducted

26   exorbitant, illegal, and unearned fees, and refused to refund those fees after Plaintiffs closed their



accounts. In addition to the fees, two Plaintiffs incurred additional legal expenses. Robert was forced to hire an attorney to reclaim part of the money Meracord withdrew from his account, and Marie had to hire an attorney to defend against lawsuits brought by her creditor.

### 1.   Dinah Canada

80.   Dinah immigrated to the United States from the Philippines in 1982. She was joined by her husband in 1988, and the two became U.S. citizens in 1994. Dinah's two daughters were born in the United States. Her son, who was born in the Philippines, is a sailor in the United States Navy Submarine Service.

81.   Dinah accumulated most of her debt due to (1) the illness of her father and father-in-law in 2004; (2) a failed investment in 2004; (3) paying expenses associated with her son's college education and transferring balances from her son's high-interest-rate accounts to her own accounts; and (4) a failed business in 2006.

82.   In 2007, several of Dinah's credit card companies unilaterally lowered Dinah's credit limits, resulting in the application of default interest rates approaching 30%. This dramatically increased the balances owed through the addition of unpaid interest to the account balances.

83.   In 2008, Dinah's husband was laid off from his job in the shipping department of a metal stamping company. The reduction in income further exacerbated her financial situation and led to further increases in her account balances.

84.   As of March 2009, Dinah's credit card debt had ballooned to $100,647.

85.   Dinah was contacted in March 2009 by Dan Gordon, who said he represented Freedom Debt Relief. Gordon told Dinah that Freedom Debt Relief could solve her debt problems by negotiating with her creditors and dramatically reducing the amount she owed.

86.   Gordon's email to Dinah had the subject: "Be Debt Free!" and read as follows:

**From:** Dan Gordon <danielgordon@gotsky.com>
**To:** [Dinah Canada]
**Sent:** Thu, March 26, 2009 2:00:03 PM
**Subject:** Be Debt Free!

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 34
Case No. 12-cv-05657-BHS
010262-13 561082 V1



HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Hello,

Getting DEPT-FREE is a phone call away with a no cost, no obligation brief consultation at toll-free 1-877-397-HELP (4357)

I know that life is very busy, and that your debt situation is very important to you. Most likely it is the cause of a great deal of stress and concern right now. Debt is difficult to deal with…but, Freedom Debt Relief can relieve that stress!

At Freedom Debt Relief, we have a unique approach:

1 - We effectively get rid of the interest & fees and provide a low monthly payment

2 - We help you get out of debt quickly (typically 30 months or less) Raise Your Credit Score!

3 -We settle your debt for thousands less than you currently owe

GUARANTEED or You Pay No Service Fees!

'You have nothing to lose but your debt!'

Freedom Debt Relief...'Helping Good People Overcome Bad Credit Experiences'
1-877-397-4357

1-877-397-HELP (4357)

87.    Dinah contacted Gordon and was promised her debt would be eliminated with easy monthly payments for five years, and that the program was guaranteed to produce results.

88.    Gordon told Dinah that she could trust his program, in part because it was administered by Meracord, which had an excellent rating with the Better Business Bureau. Dinah confirmed this was true, seeing Meracord had an A+ rating at that time.[4]

89.    Relying on Gordon's representations, Dinah e-signed a "contract" (the "EDS Contract"). The EDS Contract bore little to no resemblance to the program that Dinah thought she was getting, and was so convoluted and deceptively drafted as to be incoherent in many places, and blatantly contradictory in others. Indeed, never had Gordon even mentioned EDS ("Express Debt Settlement," or "Express Debt"), the company with whom Dinah was supposedly contracting.

---

[4] At this time, Meracord was called NoteWorld, and that is how Gordon actually referred to it and how it appeared in all relevant documents and on the BBB website. For ease of reading, all references to "NoteWorld" have been replaced with "Meracord."

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 35
Case No. 12-cv-05657-BHS
010262-13 561082 V1



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

90.   The EDS Contract's first page was titled "Important Information About Our Program." Among other promises and assurances, it said, "Compared to making minimum payments, our average client will pay a small fraction, as little as 55% of the total debt."

91.   The first page also stated: "We do not consolidate your debt, and we do not make monthly payments to your creditors. Money will accumulate in your settlement account while we work with your creditors, and therefore your monthly payments to them will fall behind."

92.   The second three pages of the EDS Contract purported to be a "Client Service Agreement" between Express Debt Settlement and Dinah. The first sentence under "Subject Matter of Agreement" reads, "Client hereby retains and employs Express Debt to assist in resolving debts owed to the following creditors[.]" It then inexplicably states: "All parties to this Agreement agree that Express Debt will not pay or directly resolve any client debt and Client expressly acknowledges it."

93.   The agreement then calls for Express Debt to "employ the Law Office of Simon & Bocksch" – yet another company that Dinah had not previously heard of.

94.   The next paragraph of the agreement called for Express Debt to get a non-refundable fee of 15% of the total debt "placed with Express Debt." It called for a monthly payment of $719.98 per month for 60 months, which "shall be distributed in accordance with attached payment schedule (Exhibit A). The monthly payment includes a $49 monthly processing fee."

95.   Exhibit A to the EDS Contract (found nine pages later) then expressly states that "Our non-refundable fee" is $0.

96.   Under paragraph six, captioned "Payments," the agreement states: Client acknowledges that Client has chosen the services of NoteWorld to assist it in saving Client's settlement funds." NoteWorld, now Meracord, was yet another company that Dinah had not previously understood was involved in her debt settlement program. The paragraph states "Express Debt does not own or control NoteWorld," but then states "Express Debt requires a

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 36
Case No. 12-cv-05657-BHS
010262-13  561082 V1

HB HAGENS BERMAN

1918 Eighth Avenue, Suite 3300 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1  minimum notice of Five (5) business days to change any scheduled electronic funds transfer

2  from Client's bank account."

3      97.   The next document in the EDS Contract was a "Authorization to Communicate"

4  drawn on the letterhead of the Law Office of Simon & Bocksch. Dinah had not previously heard

5  of Simon & Bocksch, yet this agreement purported to "appoint Simon & Bocksch and its

6  employees as [Dinah's] agents and authorize Simon & Bocksch to communicate with [Dinah's]

7  creditors and collection agencies, or other entities trying to collect debts from [Dinah]."

8      98.   The next two pages of the EDS Contract contained mostly blank "Client Personal

9  Information," followed (on page 9 of the EDS Contract) by a blank "Budget Analysis" and blank

10  "Financial Hardship." After those pages followed a list of Plaintiff's creditors and amounts owed

11  to each.

12     99.   Page 11 of the EDS Contract was "Exhibit A," which stated: "Our non-refundable fee

13  [is] $ 0."

14     100.  Pages 12 and 13 of the EDS Agreement were the Meracord "Sign-Up Agreement."

15  This "agreement" falsely claimed Meracord was an "independent third party;" purported to

16  authorize Meracord to collect the fees listed; and authorized Meracord to collect additional fees

17  for its "payment processing" services. It referred specifically to Express Debt Settlement as

18  Dinah's "Debt Settlement Company" or "DSC." The Sign-Up Agreement noted Dinah's

19  payments of $719.98 would be drawn automatically from her bank account and noted the

20  account information. It also indicated that Express Debt Settlement had a "Debt Settlement

21  Company Account ID Number" of N99067.

22     101.  Throughout the 13 pages of the EDS Contract, and on each of the "agreements"

23  described above included therein, Dinah's electronic "signature" appears nine times, each time in

24  identical electronic script with the same signature date of "4/16/2009."

25

26

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 37
Case No. 12-cv-05657-BHS
010262-13  561082 V1

HB HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

102. At no time did Gordon indicate to Dinah what the schedule would be for the payment of fees to Freedom Debt Relief, Express Debt Settlement, Simon & Bocksch, or Meracord; or the exact nature of any individual fees.

103. Nowhere in the Sign-Up Agreement, the Client Services Agreement, the Authorization to Communicate, or any of the other documents, did the EDS Contract disclose with precision the nature and timing of all of the fees Dinah was to pay under the EDS Contract. Nor did the EDS Contract disclose the fact that the first $12,000 plus of Dinah's initial payments would go *not toward paying off her debt*, but instead *toward paying fees*.

104. Despite the fact that the EDS Contract expressly anticipated the debt settlement services of Meracord, a Washington State corporation, the Contract did not include the "Notice to Debtor" required by WASH. REV. CODE § 18.28.100(7).

105. The EDS Contract also made the following false and/or misleading claims, upon which Dinah relied:

      (a)     That only Dinah would be allowed to disburse funds from her trust account – this was untrue as Meracord disbursed funds to itself and to other participants in the Meracord Enterprise;

      (b)     That "Express Debt will get you out of debt in a short period of time" – this was untrue as the only settlement ever completed for Dinah (in the over 1.5 years she was enrolled in the program) was for nearly 20% more than she owed at the time she joined the program and only occurred after she was sued by the creditor;

      (c)     That "our average client will pay a small fraction, as little as 55% of the total debt" – untrue as the only settlement completed for Dinah was for about 120% of the debt owed;

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 38
Case No. 12-cv-05657-BHS
010262-13  561082 V1



HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

(d)     That "Our non-refundable fee" was $0. In fact, Dinah paid over $17,000 under the EDS Contract and got one $2317.17 debt settlement as a result, for which she paid 20% more than she owed on the debt at the outset of the program. She requested a full refund, which was refused; and

(e)     That Dinah's monthly payment would be $719.98. In fact, Dinah's first two payments were for $971.60, and the following 19 payments were each for $737.70.

106.  Dinah received an email from Meracord containing login information for her "NoteWorld Reporter" account (now called "MyPromise," after NoteWorld changed its name to Meracord), where she could manage her Meracord escrow account. Over the course of the following year, Dinah continued to receive emails from Meracord regarding withdrawals that the company made from her bank account. Like the Sign-Up Agreement, the NoteWorld Reporter website and Meracord's emails falsely claimed that Meracord was an "independent" and "neutral" third party.

107.  Meracord received $971.60 for each of Dinah's first two payments on April 30, 2009, and June 1, 2009. It then withdrew $737.70 from Dinah's bank account each month (notwithstanding that the EDS Contract called for payments of $719.98).

108.  Despite having full knowledge of the wholly fraudulent nature of the EDS Contract, Meracord continued to extract Dinah's monthly payments from her personal bank account and to deduct unearned fees from each payment:

(a)     From Dinah's first and second payments of $971.60, Meracord deducted total fees of $971.60, equaling 100% of the payment;

(b)     From Dinah's third through 16th payments of $737.70, Meracord deducted total fees of $737.70, equaling 100% of the payment.

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 39
Case No. 12-cv-05657-BHS
010262-13 561082 V1



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

109.  In April, 2010, Dinah was sued by Chase Bank for about $2,500 on a credit card debt that was listed at $1,919 in the EDS Contract. By that time, Dinah had made two payments of $971.60 to Meracord, and nine payments of $737.70, and should have had approximately $8,582 available to settle debts. Pursuant to the instructions in the EDS Contract, Dinah attempted to contact Express Debt Settlement about the lawsuit but got no response.

110.  On August 19, 2010, Dinah sent an email to Dan Gordon, the salesman who originally sold her the Freedom Debt Relief/Express Debt Settlement program. She wrote:

> Hello Mr. Gordon:
>
> I applied for a loan modification last year through your agency. I was sued by one of my credit cards last April. Now I'm receiving notices that the bank is going to garnish my wages. I tried to let Express Debt aware through the email but did not get any response. What is going on?

111.  In response, Gordon simply sent her the phone numbers for Express Debt and the Law Office of Simon & Bocksch. Plaintiff called Simon & Bocksch and – even though by this time Meracord had received nearly $12,000 from Dinah's account – Simon & Bocksch told her that she did not have enough money in her account to settle the $2,317.77 debt and they would not represent her in court because her agreement with them was not for actual legal representation.

112.  Dinah protested that there had to be money to cover the debt as she had paid about $12,000. This is when Dinah learned that every penny she had paid so far had been taken from her Meracord account to pay fees. Her further pleas for help fell on deaf ears.

113.  Chase Bank received a judgment against Dinah and her wages were garnished.

114.  After receiving no help from Express Debt or from Simon & Bocksch, in September 2010, Dinah managed to make arrangements herself for Chase to be paid from her Meracord debt settlement account, and for Chase to stop garnishing her wages. But by that point, the settlement amount was $2,317.77 – 121% of the amount she owed when she entered the debt relief program.

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 40
Case No. 12-cv-05657-BHS
010262-13  561082 V1



HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

115. On October 13, 2010, Dinah sent the following email to Jon Simon and Jim Van Every at Simon & Bocksch and Dan Gordon:

> Hello Gentlemen:
>
> I am really very confused. I know I applied with "Freedom Debt Relief" originally and I don't know how I got transferred to "Express Debt". Is it because Freedom Debt Relief got in trouble so the name was changed to Express Debt?
>
> How did a lawyer get into this equation?
>
> I did not mean to cheat the banks by applying for a debt settlement. I thought this is a legal process. Please reassure me that I am not becoming a felon over this.
>
> I was very desperate last year but now I am going towards suicidal. The debt collectors are getting smarter. They know how to avoid talking to Mr. Simon and just torture me.
>
> Is there any "good" end to this?

116. On October 13, 2010, Jon Simon responded by email:

> Dinah. Please try to relax. You did not commit a crime and cannot and will not be put in jail for this. Freedom Debt is a branch of Express Debt. If you look at the contract you signed, you have always been a client of Express Debt's. Express Debt hires our law firm to negotiate debts for their clients. The program can and will work so again, take a deep breath and try to relax. We are here to help and not hurt you.

117. On November 9, 2010, Dinah was served in another lawsuit brought by one of her creditors, Capital One, for another debt that was supposed to be resolved through her debt settlement program. She emailed Dan Gordon, Express Debt and Simon & Bocksch as follows:

> Dear Gentlemen,
>
> Here I am again. Today I received the summons for another lawsuit. This time it is from Capital One. Since I do not have a defense, what do you suggest should I do?
>
> Over a year ago I went into a screening process with your company to qualify for a five year debt settlement program. I whole hea[r]tedly believed that was my salvation.
>
> What was the five-year debt settlement program means again?
>
> No logic nor math would tell me that I will come out of this alive. The banks are suing and I have no money to pay them back but thousands of my hard earned money ha[s] been siphoned into somebody else's accounts. This does not compute!

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 41
Case No. 12-cv-05657-BHS
010262-13 561082 V1



HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

I faxed the copy of the summons to Mr. Simon and Mr. Van Every. I do not know what good it is going to do but I have nothing else to do.

Good day gentlemen!

118. Finally, On December 10, 2011, Dinah contacted Meracord in an attempt to get back the thousands of dollars that she had paid into her debt relief program, but to no avail. Though by that time Dinah had paid $18,172.60 to Meracord, of which only $2,317.77 had been used to pay off a debt – leaving $15,854 – Meracord told Dinah it would refund only $1,105.73.

119. Despite the assurances she received from Freedom Debt Relief's representative that the company would help her "settle" her debts, and despite the EDS Contract's claims that "our average client will pay a small fraction, as little as 55% of the total debt," on information and belief, the company did absolutely nothing to begin negotiating or settling any of Dinah's debts prior to the institution of lawsuits by her creditors. And in the end, the only settlement of Dinah's debt required her to pay 20% more than she owed at the time she signed up for the program.

120. On information and belief, Meracord continued to apply 100% of Dinah's monthly payments to fees, but then when Dinah was sued by Chase Bank, and Express Debt reluctantly agreed to settle that debt (for 20% more than it was worth at the time Dinah signed up for the settlement service), Meracord retroactively deleted four monthly fee payments from Dinah's account statement and purported to apply $688.70 per month to "reserves."

121. It continued to charge its $49 maintenance fee and also charged a $20 "Trust Management Fee" against Dinah's seventeenth payment.

122. Meracord paid the Chase settlement of $2,317.77 on September 15, 2010, then immediately began again withdrawing 100% of Dinah's monthly $737.70 payments as fees for itself and its Front DSCs.

123. By the time Dinah cancelled her Meracord account in December 2010, Meracord had withdrawn $15,959.50 from Dinah's bank account. One settlement of $2,317.77 was paid to Chase Bank and $1,105.73 was ultimately refunded to Dinah. The remaining $12,536,

HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

representing an astonishing 79% of Dinah's deposits, was stripped from Dinah's account and paid to Meracord and its Front DSCs.

124. On December 10-11, 2010, Dinah emailed Express Debt, Gordon and Simon & Bocksch, expressing her dismay over the disappearance of her settlement funds.

125. On December 11, 2010, Ari Dinov of Express Debt responded and claimed that Dinah was "inconsistent" in making her payments on time. Dinov falsely accused Dinah of having missed six of 21 payments. Dinov stated:

> If we had all 21 payments like you were supposed to have made we would have an additional $5000 to offer your creditors for settlements, yet you continue to blame Express Debt for your problems that you actually created on your own and rather than accept responsibility you try to make us a scapegoat for them.

126. Dinah immediately responded to Dinov, correcting his false statement about her payments into the program and detailing the withdrawals from her checking account that automatically were sent to Meracord.

127. Dinov responded, this time claiming only that Dinah was enrolled in a 60 month program and more time was needed before settlements could be made. He even sought to get Dinah to contribute additional sums to the program while refusing to refund any money to Dinah.

128. On December 12, 2010, Dinah sent a follow-up email to Dinov, Gordon and Simon & Bocksch in which she set forth each payment that had been made to Meracord and complained that nothing had been done with her money to settle her debts.

129. Several emails and phone calls followed in which Dinah sought to get back from Meracord and its Front DSC some portion of the $12,536 that had been stripped from Dinah's account.

130. On December 15, 2010, Dinov responded by threatening to sue Dinah:

> Dinah,
>
> I am glad you have sent a dozen emails in the last 2 weeks because this is all evidence that I have, that you are constantly harassing me and my company. I am advising you to stop immediately or I will have no choice

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 43
Case No. 12-cv-05657-BHS
010262-13 561082 V1



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

but to file a lawsuit against you for slander, defamation of character and harassment. Like I mentioned to you previously you signed a 5 year contract with my company and you are only 1/3 of the way through, your expectations have been unrealistic especially because you knew that your fees are collected in their entirety upfront as referenced in the customer agreement that you read and signed. I have further advised you that it would be in your best interest to remain in the program because your fees have already been paid and we will be able to settle some of your accounts in the next few months, however you keep harassing me, my company and my employees with "insane" acquisitions [sic] and metaphors. I am giving you final warning to stop or the next time you hear from me will be from my attorney's filing suit against you.

131. Dinah effectively paid a $12,536 fee to have Meracord and its Front DSC resolve her $1,919.00 debt to Chase Bank for $2,317.

132. Throughout this nightmarish process, the only company consistently involved in managing Dinah's debt settlement account was Meracord, but when Dinah contacted Meracord, expressing her dismay with the process and seeking a refund, Meracord told her it could only refund $1,105.73 of the $15,959.50 she had already paid into the program.

133. Based on Meracord's online account statements, it took 22 maintenance fees of $49 each from Dinah's account for its own benefit as well as a $20 "trust management fee." In total, Meracord withdrew from Dinah's account and kept for itself at least $1,098.

134. Meracord withdrew from Dinah's account and provided to its Front DSC approximately $11,375 of Dinah's debt settlement funds.

135. Emails from Meracord continued to claim, falsely, that Meracord was completely separate and independent from any of the other companies involved in the scheme; and that Meracord was not a debt settlement company or debt adjuster, despite the fact that Meracord's actions clearly fell within the meaning of "debt adjuster" under the Washington Debt Adjusting Act during the relevant time period of this complaint.

136. Dinah's experience is typical of thousands of individuals who have utilized Meracord's debt settlement services and have collectively been charged millions in illegal fees.

HB HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

### 2.      Robert Hewson

137.  In August 2009, Robert owed approximately $23,000 on two credit card accounts – one with Bank of America and the other with Chase. Both accounts were subject to high interest rates. At age sixty-three, Robert believed that he could not pay off the debt before retirement and worried about having debt after retirement.

138.  In August 2009, feeling overwhelmed by his debts, Robert responded to a flyer posted at his workplace for a company called the Debt Relief Center, Inc. Because Robert is employed at a Merck Pharmaceutical site, where entry in and out of the facility requires a badge, he believed that businesses posting flyers at the facility – including the Debt Relief Center – would have to be legitimate businesses.

139.  The Debt Relief Center's flyer encouraged Robert to "[t]ake advantage of this program and get yourself out of debt between 1 and 3 years starting today. We work with your creditors based off of your hardship and financial analysis and get them to settle under 60% of what you owe them."

140.  The flyer claimed that the Debt Relief Center was a member of the International Association of Professional Debt Arbitrators and was accredited by the The Association of Settlement Companies, the United States Organizations for Bankruptcy Alternatives, and the BSI Group.

141.  When Robert called the number on the flyer for the Debt Relief Center, he reached a company called SBL/Safeguard. He was told that Safeguard was previously known as Lifeguard. The representative, Carl, was a smooth talker who assured Robert that Safeguard could negotiate a good settlement for both of his debts.

142.  Robert only spoke to Carl during this initial phone call, in which Carl told Robert that he would be required to make eighteen monthly payments of $599.00, and that Safeguard would use that money to settle and pay his debts. Eighteen payments of $599.00 totaled $10,782.00



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

(approximately 46% of the debts to be settled). Based on Carl's representations, Robert agreed to sign up with Safeguard.

143. Before sending Robert any contract, Carl asked Robert to provide his checking account number and routing number for his monthly payments.

144. Carl never explained the fees that would be deducted from Robert's payments. Carl never mentioned Meracord. Carl and Robert only discussed Robert's specific financial situation and the general downturn in the economy.

145. During this initial phone call, Carl instructed Robert to stop making any payments to his creditors and to send Safeguard any letters or notices that he received from his creditors or collection agencies. He asked Robert to send these notices to a woman named Rachel, who Robert thought was Carl's assistant. Robert sent the notices to Rachel, but after signing up with Safeguard, Robert never spoke to Carl again.

146. Later, Robert received the contract attached to an email, but doesn't remember if he signed it online or mailed it back to Safeguard. Robert's initial sign-up paperwork and contract with Safeguard (including any electronic or paper versions) have since been lost.

147. Between September 23, 2009, and February 17, 2011, Meracord withdrew monthly payments of $599.00 from Robert's bank account. In total, Meracord withdrew $10,782.00 from Robert's account, deducting the following unearned fees:

    (a)    From payments one through three, Meracord deducted total fees of $601.50 equaling over 100% of each payment.

    (b)    From payments four through seven, Meracord deducted total fees of $331.50 equaling 55.34% of each payment. In March 2010, Meracord also deducted an additional $20.00 trust management fee.

    (c)    From payments eight through fourteen, Meracord deducted total fees of $61.50 equaling 10% of each payment.

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 46
Case No. 12-cv-05657-BHS
010262-13 561082 V1



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

(d)     From payments fifteen through eighteen, Meracord deducted total fees of $49.00 equaling 8% of each payment. In March 2011, Meracord deducted an additional $23.00 trust management fee.

148.  In total, Meracord withdrew $3,800.00 in unearned fees from Robert's bank account, totaling 35.2% of the payments he had made.

149.  In December 2009, Robert received an email from Meracord. Robert did not remember Carl mentioning Meracord, nor did he remember signing up for Meracord's services. Robert contacted Meracord by email to find out if it was connected to Safeguard and if so, how. Meracord responded by email stating that it was "a third party payment processing agency in charge of creating an escrow account and processing the scheduled drafts for the purpose of the program with . . . Life Guard Financial . . . ."

150.  In July 2010, Robert contacted Meracord to retrieve the personal identification number (PIN) for his account and to ask if any funds had been deducted to pay settlements to Bank of America or Chase. According to Meracord, no money had been deducted for settlements.

151.  In early December 2010, approximately two months before the end of his scheduled eighteen-month "plan," Robert contacted Safeguard again. This time, he spoke to a different male Safeguard representative[5] who said that Carl no longer worked there. The representative said that there had been some kind of trouble and almost a complete turnover in staff, but did not elaborate on the kind of trouble. The representative also said he did not have the letters and notices that Robert had earlier sent to Rachel, and in fact said he had never heard of any Rachel who worked at Safeguard.

---

[5] Robert believes that this representative was also named Robert, but does not recall the individual's last name.

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 47
Case No. 12-cv-05657-BHS
010262-13 561082 V1



HB   HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

152. The representative assured Robert that everything at Safeguard was fine now and told him not to worry and that Safeguard would wait to contact his creditors until he had made all eighteen scheduled payments.

153. In February 2011, just before Robert completed his eighteen monthly payments, he received a letter from Midland Credit Management ("MCM"), a collection agency for Chase, asking him to call them. Before calling MCM, he called the Safeguard representative to make sure it was ok, and the representative told Robert to go ahead and call MCM. When Robert called MCM, MCM asked if Robert was a Safeguard client and asked for permission to talk to Safeguard. Robert gave MCM that permission.

154. Robert then called the Safeguard representative to let him know that he had given MCM permission to speak with Safeguard. The representative told Robert that Safeguard would call Chase within a couple of days. That was the last time that Robert talked to that representative. Robert attempted to call him the next day, and on numerous other occasions, leaving multiple voicemails, but the calls were never returned. Robert also attempted to send him a fax, but it did not go through.

155. On February 15, 2011, Robert had made eighteen payments. He was concerned about the lack of communication from Safeguard but did not panic because he thought that the company was working on at least one settlement with MCM/Chase, so he waited until April 2011 to contact Safeguard again.

156. When Robert attempted to contact Safeguard at the company's regular phone number in April 2011, no one returned his repeated calls and voicemails. He also attempted to call the Safeguard representative on the cell phone number he had provided to Robert, leaving three voicemails asking for a call back. The representative never responded.

157. Robert never received any notice that either of his debts had been settled; nor did he receive any notice or indication that Safeguard had even made any attempts to settle his debts.

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 48
Case No. 12-cv-05657-BHS
010262-13 561082 V1


HB  HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

158.  In May 2011, Robert called Meracord, either to confirm that there were settlements pending, or to close his account. The Meracord representative told Robert that the Debt Relief Center/Safeguard had been reorganized and that she would contact Safeguard and pass on his message.

159.  Robert never heard from Safeguard again.

160.  On or about May 14, 2011, Robert sent an email to Meracord, after which he received a call from someone named Randy Lewis, who said he was calling Robert regarding his account. Robert believed that Mr. Lewis worked for Meracord, but Mr. Lewis did not identify himself. Mr. Lewis told Robert that because he had made eighteen payments, he should take the best settlement he could, but did not offer any further help. Mr. Lewis told Robert that if he needed to talk further he could call and leave a message, but when Robert called and left a message, he received no response.

161.  Robert continued to email Meracord, explaining that he could not get in touch with anyone at the Debt Relief Center/Safeguard. In response, Robert simply received emails saying that that Meracord could not refund his money until he notified Safeguard. Meracord never provided Robert with a working number for Safeguard.

162.  On June 6, 2011, Robert attempted to fax a letter to Safeguard, requesting that Safeguard authorize Meracord to release the funds in his account. The fax number was disconnected.

163.  It was not until after Robert retained an attorney (discussed in more detail below) that he was able to recover some of his money from Meracord, but he has still been unable to recover the full amount that Meracord withdrew from his bank account.

164.  When Robert was unable to reach anyone at Safeguard, and Meracord refused to release any of his money without contact with Safeguard, Robert was forced to hire an attorney.

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 49
Case No. 12-cv-05657-BHS
010262-13 561082 V1

165. In July 2011, Robert's attorney researched his claims and called Meracord. In response to the attorney's phone call, Meracord refunded $7,157.00 of the $10,782.00 it had withdrawn from Robert's account. Meracord refused to refund the remaining $3,625.00, however, despite the fact that nothing had been done to settle Robert's debts.

166. Robert's legal expenses totaled $1,733.50.

167. After closing his Meracord account, Robert resolved his debts directly with his creditors. After receiving a partial refund from Meracord, Robert received a letter from an attorney for Chase about a potential lawsuit to collect his debt. Robert called the attorney and accepted the attorney's offer to settle the debt for $4,405.00. Robert then contacted his only other creditor, Bank of America, which told Robert that it had already written off his debt and was no longer attempting to collect it.

### 3. Marie Johnson-Peredo

168. In August 2010, Marie owed money on two credit cards – both with Discover Bank. Marie owed approximately $35,000, which she had accumulated over approximately five years of helping to support her family, including providing a substantial amount for her daughter's college tuition, room, and board. Marie, who works for the University of Pennsylvania Health Systems and makes less than $40,000 per year, knew it would take her many years to pay off the debt, and was desperate to find a way to relieve the emotional stress of her high debt burden.

169. In August 2010, Marie saw a television advertisement for debt consolidation services and began searching online for companies that might be able to help her pay off the overwhelming credit card debt she owed to Discover. During that search, she provided her name and contact information to a website, and as a result she was contacted by several individuals representing different companies wanting to sell her their debt relief services.

170. Some of the individuals she spoke with would not sign Marie up for their programs because her debt was with Discover. They said that their companies did not deal with Discover

HB HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1   because Discover was known for being extremely difficult to deal with and not very open to

2   settlement.

3        171.  Marie was thus relieved when a woman named Rona Favreau contacted her and told

4   her she could settle Marie's debts with Discover. Ms. Favreau called Marie on or about August

5   17, 2010, and identified herself as a representative of Lloyd Ward and Associates ("LWA"), a

6   law firm specializing in debt settlement. Marie thought that perhaps LWA's status as a law firm

7   set them apart from the other debt settlement companies and gave them a special ability to deal

8   with Discover despite the fact that others were unwilling to do so.

9        172.  Ms. Favreau also caught Marie's attention in part because Ms. Favreau told Marie

10  that she was a member of the International Association of Professional Debt Arbitrators

11  ("IAPDA"), emphasizing she was thus a "certified" debt arbitrator who was a "professional" and

12  "did this for a living." Indeed, Ms. Favreau assured Marie several times that she was

13  "legitimate," and encouraged Marie to look up her name on the IAPDA website to verify her

14  credentials. She also encouraged Marie to look up LWA's website and verify their legitimacy.

15       173.  After confirming that Ms. Favreau was indeed listed as an active member on the

16  IAPDA website, and finding LWA's website – which appeared to be for a law firm purporting to

17  specialize in "debt negotiation" – Marie again spoke with Ms. Favreau by phone on or about

18  August 19, 2010.

19       174.  During this next phone call, Ms. Favreau told Marie that LWA could settle Marie's

20  entire debt for $14,120 (approximately 40% of the total amount of the debt). Marie asked how

21  that was possible, and Ms. Favreau represented to her that because LWA had "thousands and

22  thousands" of clients "just like" Marie, the firm was able to aggregate the debts of those clients

23  with particular creditors and use that aggregated debt as leverage to settle their clients' debts for

24  "pennies on the dollar." She then asked Marie, "How does $433.34 per month sound for a

25  payment?"

26

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 51
Case No. 12-cv-05657-BHS
010262-13 561082 V1

HB HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

175. Until this point, Marie had never missed a payment on her Discover accounts and had been faithfully paying approximately $600 per month towards her debt. Ms. Favreau told Marie that when she entered the program she would stop paying that $600 to Discover and would instead pay $433.34 to Meracord/LWA. Since this was a significant improvement on her monthly payment burden, Marie told Ms. Favreau that $433.34 sounded pretty good.

176. At no point during the conversation did Ms. Favreau explain to Marie either the amount of the fees that would be deducted from her payments, or the structure of those fees. Indeed, she explained to Marie that her money would go into a Meracord "escrow" account, and would build up until LWA could negotiate a settlement with Discover. Ms. Favreau emphasized that it would _not_ be LWA deducting money out of her account, but Meracord, and that the money Meracord deducted would be "[Marie's] money," over which she would have complete control.

177. Because Ms. Favreau had gone to such lengths to assure Marie about the legitimacy of all the parties involved (LWA, Meracord, and Ms. Favreau herself), Marie trusted her. Marie assumed that there would be some fee to LWA coming out of her $433 payment, but she assumed it would be a reasonable fee, and that it would be worth it in exchange for the promise of having her debt settled at a 60% discount (which would have saved her over $20,000).

178. Based on Ms. Favreau's representations – about the process by which LWA would be able to lower Marie's debt, the amount that Marie would have to pay, the legitimacy of the companies involved, and Ms. Favreau's credentials and her assurances that she would personally negotiate with Discover Card – Marie agreed to sign up with LWA to settle her debts with Discover.

179. After Marie agreed to sign up, Ms. Favreau told Marie that she would email "the contract." When Marie asked whether she would have to sign it and send it back by mail, Ms. Favreau told her she would not have to send it back at all, because her "electronic signature"

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 52
Case No. 12-cv-05657-BHS
010262-13 561082 V1



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

would already be on the document. Ms. Favreau told Marie that the only thing she needed to sign was the limited power of attorney that LWA would send to her in the mail and that she would have to return that document by mail as well.

180. Marie understood this to mean that the contract was a "done deal" before it even got to her, since she didn't have to sign anything except the power of attorney.

181. At no point did Ms. Favreau offer to let Marie view the contract *before* Ms. Favreau electronically "signed" the document on Marie's behalf. Nor did Ms. Favreau explain the fees that would be charged under the contract – much less any other details about the contract that Marie was "signing."

182. Ms. Favreau also told Marie that the "first thing" she had to do – "immediately," before she even received any paperwork – was to call Discover and change the address and phone number that Discover had on file for her to LWA's address and phone number. Marie did as she was told, believing that by having her change her contact information with Discover, LWA was essentially "stepping into her shoes" in relation to her Discover accounts.

183. After the conversation with Ms. Favreau, Marie received LWA's "Debt Relief Package" by mail. The materials contained in the package referred to LWA and Meracord, as well as a company called Silver Leaf Debt Solutions, although Ms. Favreau had never mentioned any such company.

184. The package contained a number of pages of materials, including the following: (1) a letter congratulating Marie on her decision to let LWA "do the talking for her" and advising her to ignore all contact with her creditor; (2) a limited power of attorney, which Marie executed and returned to LWA; (3) LWA's Client Services Agreement already containing Marie's "signature"; and (4) a Meracord Sign-Up Agreement, on which her initials and "signature" had already been filled in.

185. The package referred specifically to the following entities:

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 53
Case No. 12-cv-05657-BHS
010262-13 561082 V1



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1       (a)   At the top of the first page of the Client Services Agreement, an address is

2           given for Ward personally ("Lloyd Ward, Attorney at Law");

3       (b)   The first paragraph recites that the agreement is made between Marie and "The

4           Lloyd Ward Group, PC ('Attorney');"

5       (c)   The Limited Power of Attorney appoints "Lloyd Ward and Associates," which

6           is also the name on the front of the package and in the introductory letter;

7       (d)   A letter purporting to be from SilverLeaf uses the same address for that

8           company that is used for Ward and Lloyd Ward and Associates.

9     186. Despite the fact that the Client Services Agreement expressly anticipated the debt

10 settlement services of Meracord, a Washington State corporation, the agreement did not include

11 the "Notice to Debtor" required by Wash. Rev. Code § 18.28.100(7).

12     187. Between September 2010 and October 2011, Meracord deducted $5,633.42 from

13 Marie's bank account. Starting in September 2010, Meracord withdrew Marie's monthly

14 payments of $433.34 and deducted the following unearned fees from each payment:

15       (a)   From her first three payments for the payment of fees, Meracord deducted fees

16           of $433.34 each month, totaling 100% of each payment;

17       (b)   From her fourth payment, Meracord deducted fees of $225.98, totaling 52.2%

18           of that payment;

19       (c)   From her next nine payments – between January 20, 2011, and September 19,

20           2011 – Meracord deducted a total fee of $202.98 each month, totaling 46.8% of

21           each payment.

22     188. In June 2011, Marie received two letters containing "notices of debt" from a debt

23 collection law firm informing her that it had been retained to obtain payment on Marie's

24 Discover accounts. Marie faxed the letters to LWA and was contacted by a LWA representative

25 who told her not to worry about the notice from the law firm and that she should continue to

26

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 54
Case No. 12-cv-05657-BHS
010262-13 561082 V1



HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

make her payments to Meracord and "just keep saving [her] money" so that it could be used to settle her debts.

189. Marie's debts with Discover were not settled, nor did she receive any indication from LWA that the firm was attempting to settle her debts. On October 2, 2011, she was served with two lawsuits filed against her by Discover. Marie was extremely upset emotionally by being served with a lawsuit on a Sunday while she was sitting at home, and she even worried whether she would be going to jail.

190. The following day, Marie called LWA, the firm she believed she had hired to be her attorney with respect to her Discover accounts. She thought LWA would tell her what to do about the lawsuit. She asked to speak to her account manager (who she believes was named Sylvia), but was told that Sylvia was unavailable. Marie called the next day, and the day after, and continued to be told that her account manager was unavailable.

191. Finally, on October 6, 2011, she confronted the LWA representative she happened to get on the phone, a man named Justin Andrews who identified himself as a Senior Legal Assistant. Mr. Andrews told Marie that to his knowledge, Discover Bank – the *only* creditor for which Marie had signed up for LWA's settlement services – "doesn't settle" and would not participate in debt settlement programs.

192. At that point, Marie demanded that LWA stop taking money out of her bank account and refund the money it had already taken. Of the $5,633.42 that had been deducted from her account, Mr. Andrews told her she was "only entitled" to a refund of $2,280.60. He said that LWA and Meracord had "earned" the other $3,352.82, despite the fact that at that point absolutely nothing had apparently been done to settle Marie's debts. Indeed, Mr. Andrews had just admitted that LWA had signed Marie up with her Discover accounts knowing that Discover "doesn't settle."

HB HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

193. Mr. Andrews also informed Marie that despite being a law firm and having told her that it was "representing" her with respect to her Discover accounts, LWA would not assist her in the lawsuits Discover had recently filed against her and that she would have to go to the hearings in those suits on her own.

194. That same day, Mr. Andrews sent Marie an email confirming "that your account has been closed in [Meracord]," and that she would receive a refund in the amount of $2,280.60. Again, this was $3,352.82 less than the total amount Meracord had deducted from her bank account.

195. After talking with LWA, Marie also contacted Meracord and requested that the company provide her with a copy of her transaction history. In response, Meracord mailed her an empty envelope.

196. In addition to the $3,352.82 Meracord refused to return to Marie – in exchange for which she received no services – Marie was forced to pay approximately $1,000 to an attorney to handle the lawsuits filed against her by Discover. Although the attorney was able to get the lawsuits dismissed without prejudice because of technical defects in the complaints, he told Marie that it was very likely that Discover would renew the lawsuit at some point.

197. In addition, because LWA had told Marie to stop paying Discover once she began LWA's "debt settlement" program, interest had been accruing on her accounts the entire time that her debts were purportedly being "settled." Thus, the total demand in Discover's lawsuits (as of their filing in September 2011) was $35,540.49 – approximately $1,000 more than the original amount of her debt.

198. The attorney Marie hired also helped her draft a letter to LWA seeking the return of all the money that Meracord had withdrawn from her bank account. Marie sent this letter on or about November 4, 2011. Approximately two weeks after she sent the letter, Marie received a telephone call (over the interstate wire facilities) from a "manager" at LWA. He continued to



insist that LWA had "earned" its fees, that Marie was mistaken, and that LWA had actually negotiated settlements for her with Discover. When Marie asked for evidence to support his statements, however, he told her that he did not have any actual supporting paperwork and that he could only assure her "verbally" that LWA had earned the money that had not been refunded to her. He refused to refund the remaining $3,352.82 that Marie had paid, and this was the last interaction that Marie had with LWA.

199. Throughout the sign-up process, LWA and Meracord made a number of false promises and claims:

(a)    Ms. Favreau, acting on behalf of Lloyd Ward Defendants, falsely promised Marie that LWA could settle Marie's entire debt for $14,120 (approximately 40% of the total amount of the debt) because LWA had "thousands and thousands" of clients "just like" Marie, the firm was able to aggregate the debts of those clients with particular creditors and use that aggregated debt as leverage to settle their clients' debts for "pennies on the dollar." This promise was false when it was made, since, as they later admitted, LWA knew that Discover "doesn't settle." In fact, Lloyd Ward Defendants had no intention of settling Marie's debt.

(b)    LWA verbally promised to represent Marie in any collection action by creditors. Indeed, its own documentation purports to require her to give them notice of any filed lawsuits. LWA's assurances of legal representation were false and known to Lloyd Ward Defendants to be false when made. In fact, despite holding itself out as a law firm representing Marie, LWA had no intention of providing any legal representation or defense in any lawsuit and in fact, never did so.

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 57
Case No. 12-cv-05657-BHS
010262-13 561082 V1

HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

(c)     Through its introductory letter, Lloyd Ward Defendants represented to Marie that "[o]ver the next several months, you will be working with a dedicated team of professionals whose main objective is assisting you on your journey [back towards debt-free living]," and that "your personal advisor from our Settlement Team will be in contact with you regularly to discuss any possible settlement offers you or [LWA] may receive." These statements were false when made. In fact, Lloyd Ward Defendants had no intention of actually performing any debt settlement services and in fact performed no debt settlement services.

(d)     The Client Services Agreement claimed that "[LWA] will act as Client's attorney to negotiate with Client's creditors . . . for the express purpose of reducing Debts . . . ." In fact, LWA had no intention of ever actually performing any debt settlement services and in fact, did not ever perform any debt settlement services;

(e)     When Marie faxed to LWA a copy of collection notices she received, LWA's representatives instructed her to continue to deposit money into the account because it would be used to settle the debt. That assurance was false and known to LWA to be false. In fact, LWA had no intention of settling any debts and Marie would have been far better off had she immediately ceased permitting LWA to automatically debit her account;

(f)     Meracord's Sign-Up Agreement claimed that Meracord was an "independent third party." In fact, Meracord is deeply intertwined and actively conspires with LWA and other Front DSCs by among other things, assisting in the fraudulent transfer of portfolios and accounts without proper authorization. By providing this Sign-Up Agreement to Marie, Lloyd Ward Defendants adopted and ratified this false statement. This statement was known by LWA to be false.

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 58
Case No. 12-cv-05657-BHS
010262-13 561082 V1



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

200. Marie relied on the above false and fraudulent statements in authorizing the Meracord Enterprise to debit money from her account and in continuing to authorize the withdrawals. Had she known the truth, Marie never would have signed up for LWA's fraudulent debt settlement services. Had she discovered the truth after signing up, Marie would have immediately canceled her account with LWA and the authorizations for Meracord to withdraw money directly from her account.

201. The experiences of Marie are illustrative of Lloyd Ward Defendants' – and Meracord's facilitation of Lloyd Ward Defendants' – unscrupulous, fraudulent, and deceptive recruitment of customers for its fraudulent and unlawful debt settlement services and its failure to fulfill its promises to those customers. On information and belief, Lloyd Ward Defendants have similarly defrauded thousands of other consumers as part of the activities of the Meracord Enterprise.

## V.    ARBITRATION CLAUSES

### A.    MERACORD

202. Meracord has expressly and irrevocably waived its rights to compel any arbitration of the causes of action and claims contained herein.

203. Specifically, Meracord's Terms and Conditions, provided to Plaintiffs Hewson and Johnson-Peredo, and on information and belief, provided to all its customers, expressly state that "[a]ny and all legal action" against Meracord "must be transacted or brought in a court located in the State of Washington." These terms and conditions also expressly state that Meracord is "not a party" to the contract between Plaintiffs and the Front DSC and "is not bound by the terms of the contract between the Customer and [any Front DSC]."

204. Plaintiff Canada has been unable to locate her Meracord Terms and Conditions, but has no reason to believe that its terms differ from those described above.

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 59
Case No. 12-cv-05657-BHS
010262-13  561082 V1


HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

205. In light of this language in their own terms and conditions, Meracord's attempts to take advantage of "arbitration clauses" buried in the Front DSC agreements lack any good faith basis in law.

206. Meracord's attempts in this litigation to take advantage of arbitration clauses buried in Plaintiffs' Front DSC agreements also lacks any good faith basis in *fact*. In particular, on information and belief, Meracord's counsel have made no efforts to verify that the Front DSC's with whom Plaintiffs purportedly transacted had authority to transact any business, let alone fraudulent debt settlement business, at the time Plaintiffs purportedly contracted with the relevant Front DSCs.

207. For example, the purported contract of Plaintiff "Rober Hewson"[6] produced by Meracord in this litigation purports to have been executed in August 2009 between Mr. Hewson and an entity called Lifeguard Financial, Inc. The telephone number listed on the contract is disconnected. Neither of the two web addresses www.lgfftw.com or www.lgf101.com function or forward to any functioning web address.

208. According to the Florida Secretary of State, an entity known as Lifeguard Financial, Inc. was registered in April 2008 at the Florida address listed on Mr. Hewson's purported contract. It filed a single annual report and then became inactive on January 26, 2009. Therefore, at the time Mr. Hewson purportedly contracted with Lifeguard Financial, it was a defunct corporation with no lawful authority to do business. Moreover, even if Lifeguard Financial, Inc. were a functioning entity when Mr. Hewson purportedly contracted with it, it is clearly not a functioning entity now.[7] Any argument that Mr. Hewson is "estopped" from ignoring an arbitration clause in the contract of a wholly defunct entity Lifeguard Financial, Inc. lacks any good faith basis in fact.

---

[6]   His name is not spelled correctly in the purported contract produced by Meracord.

[7]   Florida corporate record show another entity Lifeguard Financial LLC was formed on January 26, 2009, using the same address as Lifeguard Financial, Inc. That entity was administratively dissolved in September of 2010 for failing to file any annual report.

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1

**B.      LLOYD WARD DEFENDANTS**

2   209.  Lloyd Ward Defendants' Client Services Agreement contains an arbitration provision

3   that purports to require that disputes over the amount of fees charged shall be submitted to

4   arbitration in Texas. This clause is procedurally and substantively unconscionable and

5   unenforceable.

6   210.  Plaintiff Marie Johnson-Peredo orally retained Lloyd Ward Defendants as her

7   attorneys for the purposes of settling her debts. In violation of their ethical and fiduciary duties,

8   Lloyd Ward Defendants did not disclose the existence of the arbitration clause prior their oral

9   retention. Indeed, the policy and practice of Lloyd Ward Defendants was not to mention the

10  arbitration clause when Lloyd Ward Defendants induced consumers to sign up for their

11  fraudulent debt settlement services.

12  211.  Subsequent to retaining Lloyd Ward Defendants, Marie received a "pre-signed"

13  Client Services Agreement containing an arbitration clause.

14  212.  At no point in time did Lloyd Ward Defendants provide Marie or any other class

15  member with sufficient information about the differences between litigation and arbitration to

16  permit them to make an informed decision about whether to agree to binding arbitration.

17  Specifically, Lloyd Ward Defendants failed to inform Marie or any other class member that an

18  agreement to arbitrate would (i) require them to waive their right to a jury trial, (ii) reduce the

19  level of discovery they could obtain, and (iii) require them to waive their right to a judicial

20  appeal. This failure violated Lloyd Ward Defendants' fiduciary and ethical duties as outlined in

21  the American Bar Association's ethical guidelines, the Washington State Bar Association's

22  Rules of Professional Conduct, and the Texas Disciplinary Rules of Professional Conduct – all of

23  which require that an arbitration clause be clearly disclosed and that its risks and benefits be

24  clearly explained.

25

26

HB  HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

213. Even if the Lloyd Ward Defendants' arbitration clause were enforceable, its enforcement has been clearly and unambiguously waived by Lloyd Ward. The clause expressly grants LWA "thirty (30) days" to initiate a mediation and/or arbitration after which point Plaintiff may initiate a "public or private complaint[]." At the latest, Marie gave notice to LWA on November 4, 2011, when she sent LWA a detailed letter demanding a full refund. Despite receiving this demand, LWA never sought or initiated any arbitration or mediation. Lloyd Ward Defendants have therefore waived any right to arbitration.

## VI.      CLASS ALLEGATIONS

214. Plaintiffs bring this case as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons in the United States who established an account with Defendant Meracord LLC (or any subsidiary thereof) from which Meracord processed any payments related to any debt settlement program prior to June 7, 2012. Excluded from the Class are Defendants, its officers and directors, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

215. The members of the Class are so numerous that joinder is impracticable. While the exact number of Class members is presently unknown to Plaintiffs, and can only be ascertained through appropriate discovery, Plaintiffs believe that there are tens of thousands of members in the proposed Class and the total number of class members likely exceeds one hundred thousand.

216. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' conduct in violation of law that is complained of herein.

217. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action litigation.



218.   Certification under Fed. R. Civ. P. 23(b)(3) is appropriate because common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members. Among the questions of law and fact common to the Class are:

(a)   Whether Meracord or its Front DSCs – including Lloyd Ward Defendants – were engaged in debt adjusting within the meaning of WASH. REV. CODE § 18.28 during the relevant time period or are otherwise subject to that statute;

(b)   Whether Class members' debt settlement agreements with members of the Meracord Enterprise are *void ab initio*;

(c)   Whether RICO was violated by Defendants' acts and omissions as alleged herein;

(d)   Whether standardized fees charged by the Meracord Enterprise are unlawful or otherwise constitute an unfair or deceptive trade practice;

(e)   Whether Meracord's' standardized practices with respect to the maintenance and management of Class members' debt settlement accounts violate WASH. REV. CODE § 18.28, or otherwise constitute unfair or deceptive business practices, and whether Meracord should be enjoined from such practices;

(f)   Whether Meracord Defendants knowingly and substantially assisted their Front DSCs in violating WASH. REV. CODE § 18.28 and/or WASH. REV. CODE § 19.86;

(g)   Whether the statute of limitation for Plaintiffs' and Class members' claims should be properly tolled;

(h)   Whether Defendants should be estopped from relying on the statute of limitation for Plaintiffs' claims;

(i)   Whether Defendants' wrongful conduct resulted in economic damage to Plaintiffs and members of the Class, and the amount of said damages;

(j)   Whether the Court can enter declaratory and injunctive relief; and

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 63
Case No. 12-cv-05657-BHS
010262-13 561082 V1

HB   HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

(k)     The proper measure of disgorgement and/or actual and/or punitive damages and/or restitution.

219. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VII.    CLAIMS FOR RELIEF

### COUNT I.
### (VIOLATION OF 18 U.S.C. § 1962(C))

220. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein

221. This Count, which alleges substantive violations of RICO, as provided in 18 U.S.C. § 1962(c), is asserted against the Defendants on behalf of the Class.

222. Plaintiffs, Class members, and Defendants are each "persons" as that term is defined in 18 U.S.C. § 1961(3).

223. The RICO "enterprise" is an association-in-fact (the "Meracord Enterprise") and consists of Meracord and its Front DSCs, including but not limited to Lloyd Ward Defendants, Freedom Debt Relief, SilverLeaf, Express Debt, Simon & Bocksch, Safeguard, First Rate Debt Solutions, Debt Relief Center, Lifeguard Financial and others engaging in fraudulent and deceptive practices designed to enroll consumers in useless debt settlement plans and extract unearned fees from them ("the Meracord Scheme"). The Meracord Enterprise is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of advancing the Meracord Scheme.

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 64
Case No. 12-cv-05657-BHS
010262-13 561082 V1



HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1  Members of the Meracord Enterprise operate businesses that perform services and have business

2  relationships that are distinct from the pattern of racketeering alleged herein.

3      224. The Meracord Enterprise is an ongoing organization that engages in, and whose

4  activities affect, interstate commerce and has an existence apart from the racketeering acts set

5  forth herein.

6      225. While Defendants participate in and are members and parts of the Meracord

7  Enterprise, they also have existences separate and distinct from the Meracord Enterprise. For

8  example, Meracord maintains a business servicing private mortgages that is separate and distinct

9  from the Meracord Enterprise, and Lloyd Ward Defendants similarly maintain businesses

10 separate and apart from its debt settlement practice. For example, Lloyd Ward Defendants are

11 involved in the sale of automobile warranties.

12     226. In order to increase their revenue and profits, members of the Meracord Enterprise

13 need to enroll a continuous stream of customers into their debt settlement programs. The

14 Meracord Enterprise provides that stream by fraudulently inducing Class members to enter into

15 illegal contracts through which members of the Meracord Enterprise extract illegal fees directly

16 from Class members' bank accounts.

17     227. A critical component of the Meracord Scheme is the use of the Meracord-provided

18 account management software and the insertion of the Meracord "contracts" into the contracts

19 foisted upon consumers by the Front DSCs. Without these integral steps, the Meracord

20 Enterprise would not have the ability to automatically withdraw thousands of dollars from Class

21 members' bank accounts and then distribute unearned and illegal fees from Class members'

22 escrow accounts.

23     228. The members of the Meracord Enterprise share the common purpose of engaging in

24 fraudulent and deceptive practices designed to enroll consumers in useless debt settlement plans

25 and extract unearned fees from them. Each of the members of the Meracord Enterprise is

26

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 65
Case No. 12-cv-05657-BHS
010262-13 561082 V1



HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

rewarded financially based on its abilities to perform its role as a member of the Meracord Enterprise.

### F.      Conduct of the RICO Enterprise's Affairs

229.  During the Class Period, Defendant Meracord has, in violation of Section 1962(c) of RICO, conducted or participated in the conduct of the affairs of the RICO Enterprise, directly or indirectly, by making false statements and promises in an attempt to encourage Class members to sign up for debt settlement programs through the Meracord Enterprise, and by extracting and processing debt settlement payments knowing that the underlying contracts provided for illegal fees and that Class members had signed those contracts based on the fraudulent and deceptive activities of the Enterprise's Front DSCs. Defendant Meracord has taken these actions with the knowledge of and at the direction of Remsberg.

230.  During the Class Period, Lloyd Ward Defendants have, in violation of Section 1962(c) of RICO, conducted or participated in the conduct of the affairs of the RICO Enterprise, directly or indirectly, by making false statements and promises in an attempt to encourage Class members to sign up for debt settlement programs through the Meracord Enterprise. The institutions that make up Lloyd Ward Defendants have taken these actions at the direction of Ward.

### G.      Defendant's Pattern of Racketeering Activity

231.  Defendants conducted and participated in the affairs of the above-referenced Meracord Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 2314, relating to the interstate transportation of stolen property; 18 U.S.C. § 1341, relating to mail fraud; 18 U.S.C. § 1343, relating to wire fraud; and 18 U.S.C. § 1344, relating to bank fraud. Defendants' pattern of racketeering likely involved thousands of separate instances of use of the U.S. mails or interstate wire facilities in furtherance of the Meracord

HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Scheme, as well as many instances involving the interstate transmission of potentially millions of dollars in fraudulently obtained fees, which were withdrawn from accounts under the custody and control of financial institutions. Each of these instances constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), in which the Defendants intended to defraud Plaintiffs, the members of the Class and other intended victims.

232. Defendants' racketeering activities amounted to a common course of conduct, with similar pattern and purpose, intended to defraud Class members. Each separate instance of racketeering employed by Defendants was related, had similar intended purposes, involved similar participants and methods of execution, and had the same injurious results affecting the same victims, including Plaintiffs and Class members. Defendants have engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the Meracord Enterprise.

### 1. Defendants' Use of the U.S. Mails and Interstate Wire Facilities in Violation of 18 U.S.C. §§ 1341 & 1343.

233. Defendants' illegal conduct and wrongful practices were carried out by an array of agents and members of the Meracord Enterprise, working across state boundaries, who necessarily relied upon frequent transfers of documents, information, products, and funds by the U.S. mails and interstate wire facilities. The nature and pervasiveness of the Meracord Scheme, which was orchestrated primarily out of the offices of the Meracord Defendants, Lloyd Ward Defendants, and other Front DSCs, necessarily required those offices to communicate directly and frequently with each other and with Class members by the U.S. mails and by interstate wire facilities. On the portion of its website devoted to marketing its debt settlement services, Defendant Meracord boasts that it is a licensed "money transmitter" in approximately forty states.



234. Many of the precise dates of Defendants' uses of the U.S. mails and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to these Defendants' books and records. However, Plaintiffs can ascertain when and how their transactions involved the mail and wire facilities and can and have described above several of the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the Meracord Scheme.

235. Defendants' use of the U.S. mails and interstate wire facilities to perpetrate the Meracord Scheme involved thousands of communications including telephone, email, and U.S. Mail communications to Class members. Use of the U.S. Mail, email, and telephone systems also occurred on hundreds if not thousands of occasions where members of the Meracord Enterprise communicated among themselves. In addition to these RICO predicate acts, it was foreseeable to the Defendants that Meracord and its Front DSCs (including Lloyd Ward Defendants) would communicate with Class members by the U.S. mails and by interstate wire facilities. Further, Defendants have, in furtherance of the Meracord Scheme, communicated through use of the U.S. mails and by interstate wire facilities with their various offices or divisions.

236. Indeed, Defendants' business models and the ensnarement of Class members in this scheme is predicated upon and relies on use of the interstate wire facilities. Class members often "e-sign" their documents using the Internet (an instrument of interstate commerce) to indicate acceptance of the agreements. Further, the agreements are often then transmitted to Class members over the Internet for them to print on their home computers, or may sometimes be sent to Class members through the U.S. mail system. Examples of such mailings and transmissions with respect to Plaintiffs are set forth in detail above. Thus, for each and every Class member, the initiation of the scheme itself is done through the wires or the mails and involves at the very least the wire or mail communication in which their Contract was delivered to them, and often many other email and phone communications as well.

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

237. Specifically, Defendants perpetrated the Meracord Scheme against Plaintiffs through interstate mail and wire facilities by sending emails and documents from Washington, Texas, and potentially other states, to Plaintiffs in Pennsylvania and Illinois.

238. All three Plaintiffs received contracts via the Internet. In March 2009, Dinah received her EDS Contract via email. In August 2009, Robert received his contract with Safeguard as an attachment to an email. On or about August 19, 2010, Marie also received her contract with LWA – already electronically signed for her – by email.

239. All three Plaintiffs received notices about their Meracord accounts by email.

240. Robert received at least one notice by email, on December 18, 2009, that Meracord withdrew his payment of $599.00.

241. On October 6, 2011, Marie received an email from LWA confirming that her Meracord account had been closed and that she would receive a refund of $2,280.60.

242. Robert exchanged emails with Meracord on several occasions:

(a) On December 21, 2009, Robert emailed Meracord because he did not recall Carl mentioning Meracord and was confused as to why he received an email from Meracord. On December 22, Meracord responded and falsely claimed that it was only a "third party payment processing agency."

(b) On July 17, 2010, Robert emailed Meracord to request his PIN and ask questions about his account, including whether any payments had been made to his creditors. On July 19, 2010, Meracord responded with Robert's PIN and stated that no payments had been made to his creditors.

(c) On May 14, 17, and 18, 2011, Robert emailed Meracord to inform it that he could not reach anyone at the Debt Relief Center and to request a refund. On May 17, 2011, Meracord responded with questions to verify Robert's identity, and on May 18, 2011, Meracord responded to Robert's request for a refund by



1    stating that "If you wish to close your Meracord account, you will need to

2    notify Meracord and your service provider 5 or more business days before your

3    next scheduled payment."

4    243. Marie received documents from Defendants in the mail:

5        (a)    On or about August 19, 2010, LWA – and Meracord through LWA – used the

6            mail to send Marie a "Debt Relief Package" that included both LWA

7            documents and a Meracord Sign-Up Agreement on which Marie's initials and

8            "signature" had already been filled in.

9        (b)    On or about June 24, 2011, Marie received a letter from LWA regarding

10            changes to their mailing address and phone number, as well as an attempt by

11            LWA to distance itself from SilverLeaf, one of the entities involved in Marie's

12            transactions with LWA. The letter contained both Ward's personal email

13            address, as well as the address for "Lloyd Ward & Associates," but was signed

14            by Ward on behalf of Defendant Lloyd Ward Group, P.C.

15    244. Dinah also received notices via email and both Meracord and her Front DSCs

16    communicated with Dinah via the internet:

17        (a)    On March 26, 2009, Dan Gordon of Freedom Debt Relief sent the email to

18            Dinah described above with the subject "Be Debt Free!"

19        (b)    On April 16, 2009, Dinah used the Internet to "e-sign" the Contract, which

20            included Meracord's Sign-Up Agreement, provided to her by Freedom Debt

21            Relief and/or Express Debt.

22        (c)    Each time Meracord withdrew payments from Dinah's bank account

23            (approximately 20 times between April 30, 2009, and November 12, 2010),

24            Meracord sent Dinah an email confirming the withdrawal. These emails

25            contained false statements claiming that Meracord was an "independent" and

26

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 70
Case No. 12-cv-05657-BHS
010262-13 561082 V1



HB   HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

"neutral" third party and denying that Meracord was a debt settlement company.

(d)     On September 15, 2010, Meracord sent Dinah an email notifying her of the proposal to settle Plaintiff's debt to Chase of $1,919 for $2,317.77.

(e)     On December 10, 2010, Meracord sent Dinah two emails in which Meracord acknowledged Dinah's request to close her account; refused to refund the illegal and unearned fees Meracord had withdrawn from Dinah's account; and stated that it would refund only "$1,105.73, less any fees owed to your debt relief service provider."

245.  The mailings and emails to Plaintiffs are typical of the use of the wires and mails to thousands of other Class members.

**2.     Defendants' Interstate Transportation of Stolen Property in Violation of 18 U.S.C. § 2314**

246.  The Meracord Enterprise has developed a scheme, described in the above paragraphs of this Complaint, to obtain money from Class members by fraudulent means.

247.  In furtherance of this scheme, Defendant Meracord transmits – at the direction of Remsberg, and with the knowledge and approval of Lloyd Ward Defendants – Class members' monthly payments and fees in amounts exceeding $5,000 in interstate commerce. Defendants do so despite knowing that the authorization for those payments and fees are obtained by fraud.

248.  Specifically, over the course of Plaintiffs' dealings with Meracord, the company transmitted over $15,000 from Dinah's bank account in Illinois, over $10,000 from Robert's bank in Pennsylvania, and over $5,000 from Marie's bank in Pennsylvania, to trust accounts held by Meracord's bank in Washington and/or other states. The fraudulent transfers from Marie's bank account in Pennsylvania were authorized in writing by Lloyd Ward Defendants. At the time of authorization, Lloyd Ward Defendants knew that these payments were converted or taken by fraud.

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 71
Case No. 12-cv-05657-BHS
010262-13 561082 V1



HB  HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

249. On information and belief, Meracord transmits over $5,000 for each of the thousands of Class members in an ongoing pattern that continues with the ensnarement of each additional victim. Indeed, many, if not all, of the Front DSCs require that a consumer have at least $10,000 in debt in order to enroll in the program, which necessitates transfers exceeding $5,000. LWA employees have confirmed in depositions taken in other cases that LWA's policy was to require its victims to possess at least $10,000 in debt in order to enroll in its predatory program.

**3.      Defendants' Commission of Bank Fraud Under 18 U.S.C. § 1344**

250. Defendants knowingly executed the scheme described in previous paragraphs of this Complaint ("the Meracord Scheme") to obtain money, by means of fraudulent pretenses, representations, and promises, from Class members' bank accounts, which were under the custody and control of financial institutions.

251. Specifically, as described above, Defendants, through the Meracord Enterprise, obtained by fraudulent means:

  (a)   Dinah's authorization to withdraw money from her Charter One Bank account and/or her Chase Bank account, each of which was under the custody and control of a financial institution, as described by the bank fraud statute;

  (b)   Robert's authorization to withdraw money from his checking account, which was under the custody and control of Merck Employees Federal Credit Union, a financial institution; and

  (c)   Marie's authorization to withdraw money from her checking account, which was under the custody and control of Sovereign Bank, a financial institution.

252. On information and belief, the same process involving fraud in obtaining authorization to withdraw money from Class members' bank accounts is repeated in a continuing and ongoing pattern with the ensnarement of each additional Class member victim.

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 72
Case No. 12-cv-05657-BHS
010262-13 561082 V1

HB  HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

**H.      Damages Caused by the Meracord Scheme**

253. Defendants' violations of federal law and its pattern of racketeering activity have directly and proximately caused Plaintiffs and members of the Class to be injured in their business or property because Plaintiffs and the Class:

    (a)    Paid fees in excess of legal limits and otherwise in violation of applicable state and federal law for their debt settlement programs;

    (b)    Would not have entered into those debt settlement programs if they had been aware of the illegality of the fees and/or the fraudulent nature of the scheme devised by the Meracord Enterprise;

    (c)    In many cases, paid fees for services that were never performed, and were unable to get refunds for those fees because of the fraudulent and deceptive practices of the Meracord Enterprise;

    (d)    Suffered continuing harm to their credit and creditworthiness as a result of the fraudulent and deceptive practices of the Meracord Enterprise;

    (e)    In many cases, incurred substantial legal fees as a result of the fraudulent and deceptive practices of the Meracord Enterprise, whether in pursuit of refunds from the Enterprise, or in the defense of lawsuits by creditors brought about by Class members' enrollment in the Enterprise's debt settlement programs; and

    (f)    In many cases, had judgments entered against them related to their failure to pay their debts as a result of entering into the Meracord Enterprise's "debt settlement" programs – sometimes despite the existence of valid defenses to those debts, including but not limited to statute of limitations defenses.

254. Plaintiffs were harmed by the Meracord scheme because had they known: (1) that the fees they would be charged exceeded legal limits and were illegal; (2) that both Meracord and its Front DSCs were deceiving them about the true nature of their relationships; and (3) the true nature of the debt settlement programs hidden by the Meracord Enterprise, they would not have

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 73
Case No. 12-cv-05657-BHS
010262-13 561082 V1



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

entered into the contracts. Instead, they would have either purchased debt settlement services elsewhere or, more likely, would have simply settled the debts themselves.

255. Under the provisions of Section 1964(c) of RICO, Defendants are liable to Plaintiffs and members of the Class for three times the damages that Plaintiffs and the Class members have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

## COUNT II.
### (VIOLATION OF 18 U.S.C. § 1962(D))
### (AS AGAINST ALL DEFENDANTS)

256. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

257. Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provision of subsection (a), (b), or (c) of this section."

258. Defendants have violated § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy was to conduct or participate in, directly or indirectly, the conduct of the affairs described previously through a pattern of racketeering activity.

259. Defendants conspired with other affiliates in order to further and perfect the financial goals of the Meracord Enterprise. Meracord had overt written and oral agreements with the Front DSCs – including Lloyd Ward Defendants – and other affiliates to further the goals of the Meracord Enterprise and to engage in the pattern of racketeering activity alleged herein. The nature of the acts, material misrepresentations and omissions in furtherance of the conspiracy gives rise to an inference that Defendants and their affiliates not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

260. As a direct and proximate result of Defendants' and the other Meracord Enterprise members' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by



HAGENS BERMAN

1918 Eighth Avenue, Suite 3300 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

conspiring to violate 18 U.S.C. § 1962(c), Plaintiffs and the Class have been and are continuing to be injured in their business or property.

261. Defendants and the members of the Meracord Enterprise sought to and have engaged in the commission of and continue to commit overt acts, including the following unlawful racketeering predicate acts:

(a)  Multiple instances of mail and wire fraud violations of 18 U.S.C. §§ 1341 and 1342;

(b)  Multiple instances of mail fraud violation of 18 U.S.C. §§ 1341 and 1346;

(c)  Multiple instances of transporting fraudulently obtained money in violation of 18 U.S.C. § 2314;

(d)  Multiple instances of bank fraud in violation of 18 U.S.C. § 1344; and

(e)  Multiple instances of unlawful activity in violation of 18 U.S.C. § 195.

### COUNT III.
### (VIOLATION OF THE WASHINGTON DEBT ADJUSTING ACT)
### (AS AGAINST ALL DEFENDANTS BY PLAINTIFF JOHNSON-PEREDO)
### (AS AGAINST MERACORD DEFENDANTS BY REMAINING PLAINTIFFS)

262. Meracord and LWA are for-profit debt adjusters under the meaning of WASH. REV. CODE § 18.28 (prior to June 7, 2012), since they are engaged in the business of receiving funds for the purpose of distributing said funds among creditors in payment or partial payment of obligations of a debtor. At all times when engaged in the business of debt adjustment and when marketing its debt settlement services, Meracord acts at the direction of Remsberg.

263. By conspiring with Meracord, a Washington State corporation with its principal place of business in Tacoma, Washington, Lloyd Ward Defendants have purposefully engaged in the business of debt adjustment in Washington State. In addition, by purposefully directing their fraudulent debt settlement practices at Washington residents, Lloyd Ward Defendants have

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 75
Case No. 12-cv-05657-BHS
010262-13 561082 V1



HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

purposely availed themselves of the privilege of conducting activities within Washington, thus invoking the benefits and protections of its laws.

264. Defendant Meracord (at the direction of Remsberg), LWA (at the direction of Ward), and the Meracord Enterprise charged excessive and unreasonable fees for debt adjustment services, in violation of WASH. REV. CODE § 18.28.080, including:

    (a)    Fees for single payments exceeding 15% of those payments for all three Plaintiffs, with some fees representing 100% (or even more) of an individual payment for all three Plaintiffs; and

    (b)    Total fees representing 79%, 35%, and 59.2% of the total payments made, for Dinah, Robert, and Marie, respectively, and over 15% of the total debt to be settled for Robert.

    (c)    Defendants failed to comply with other requirements of the Debt Adjusting Statute, including:

        (i)    Failing to return to Plaintiffs and Class members' the amount of all payments received, despite knowing that their debt adjustment contracts were illegal and *void ab initio* under WASH. REV. CODE § 18.28.090;

        (ii)    Failing to notify Plaintiffs' and Class members' creditors that it had been engaged as a debt adjuster, as required by WASH. REV. CODE § 18.28.080(2) ,before a debt adjuster may retain *any* fees;

        (iii)    In violation of WASH. REV. CODE § 18.28.100, failing to disclose in precise terms the rate and amount of all fees to be charged under its debt settlement contracts; failing to include in the contracts the "Notice to Debtor" required by the statute; and failing to adequately disclose the true nature of the relationships between all of the entities involved in the Contract, which was necessary for the protection of Plaintiffs;

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 76
Case No. 12-cv-05657-BHS
010262-13 561082 V1

HB HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

(iv) Failing to distribute at least eighty-five percent (85%) of each payment received from Plaintiffs and Class members to their creditors within forty days after receipt of the payment, as required by WASH. REV. CODE § 18.28.110(4);

(v) Permitting the debt adjusting services in which they participated to be advertised by its Front DSCs in false, misleading, or deceptive statements or representations, and – in the case of Lloyd Ward Defendants – advertising their services using false, misleading, or deceptive statements or representations, in violation of WASH. REV. CODE § 18.28.120(6);

(vi) In the case of Meracord Defendants, receiving fees from its Front DSCs in connection with its debt adjusting services, in violation of WASH. REV. CODE § 18.28.120(8); and

(vii) Using the name and letterhead of a law firm in connection with their debt adjusting services, in violation of WASH. REV. CODE § 18.28.130.

265.  With the knowledge and approval of Lloyd Ward Defendants, Meracord employees located in the State of Washington have (i) caused funds to be withdrawn unlawfully from Plaintiffs' and class members bank accounts, (ii) caused the exorbitant and unlawful fees described above to be charged and (iii) distributed portions of those unlawful fees to LWA and other Front DSCs.

**COUNT IV.**
**(VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT,**
**WASH. REV. CODE § 19.86)**
**(AS AGAINST ALL DEFENDANTS BY PLAINTIFF JOHNSON-PEREDO)**
**(AS AGAINST MERACORD DEFENDANTS BY REMAINING PLAINTIFFS)**

266.  Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 77
Case No. 12-cv-05657-BHS
010262-13 561082 V1



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

267. Plaintiffs and members of the Class are persons within the meaning and coverage of the Washington Consumer Protection Act, RCW 19.86 (the "CPA").

268. The CPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of commerce . . . ." RCW 19.86.020.

269. Defendant Meracord (at the direction of Remsberg) and Lloyd Ward Defendants (at the direction of Ward), for compensation, received and managed funds of Plaintiffs and Class members for the purported purposes of distributing said funds among creditors in partial satisfaction of obligations of Plaintiffs' and Class members' debts.

270. Defendants and the other Front DSC members of the Meracord Enterprise are debt adjusters and otherwise engaged in debt adjusting within the meaning of WASH. REV. CODE § 18.28.

271. As described above in Count III, in carrying out the Meracord Scheme, Defendant Meracord (at the direction of Remsberg) and Lloyd Ward Defendants (at the direction of Ward) have violated WASH. REV. CODE § 18.28 at the direction of Remsberg.

272. Defendants' conduct, as detailed above, constitutes unfair and deceptive acts and practices in violation of the CPA.

273. Defendants' conduct occurred in the conduct of trade or commerce in the State of Washington.

274. By routing unlawful fees through the State of Washington, Lloyd Ward Defendants and Meracord have made the State of Washington into a financial haven for unscrupulous debt settlement companies. Furthermore, Defendants, including Lloyd Ward Defendants, have actively targeted Washington State consumers in order to induce them to sign up for their fraudulent debt settlement services.

275. Defendants' deceptive acts or practices impact the public interest and have the capacity to deceive a substantial portion of the public. The acts are committed in the course of

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 78
Case No. 12-cv-05657-BHS
010262-13 561082 V1



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Defendants' business; the acts are part of a pattern or generalized course of business; the acts were committed repeatedly prior to the acts involving Plaintiffs and since; and there is a real and substantial potential for repetition of Defendants' conduct.

276. Defendants' unfair and deceptive acts and practices have directly and proximately caused damage to the Plaintiffs and members of the Class. But for Defendants' unfair and deceptive acts and practices, Plaintiffs and the Class would not have suffered an injury.

**COUNT V.**
**(AIDING AND ABETTING THE COMMISSION OF**
**UNFAIR AND DECEPTIVE BUSINESS CONDUCT)**
**(AS AGAINST MERACORD DEFENDANTS)**

277. Meracord Defendants knowingly aided and abetted their Front DSCs in the commission of criminal, unfair, and deceptive practices, including practices violating WASH. REV. CODE §§ 18.28 & 19.86, by giving substantial assistance that proximately caused harm to Plaintiffs and to Class members in their business and property. Such assistance included, *inter alia*:

    (a)    Offering to serve and serving as a processor of debt settlement funds procured by illegal debt settlement contracts;

    (b)    Promoting illegal debt settlement programs to consumers and contracting with consumers for such illegal debt settlement programs;

    (c)    Assuming and violating duties owed under WASH. REV. CODE § 18.28, as described above in Count III;

    (d)    Offering to assume authority, assuming authority, and exercising authority to transfer Class members' funds to Meracord's debt settlement accounts for the purpose of paying illegal and unearned fees;

    (e)    Paying illegal, unfair, deceptive, and unearned fees from those debt settlement accounts; and

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 79
Case No. 12-cv-05657-BHS
010262-13 561082 V1



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

(f)   Offering to assume authority, assuming authority, and exercising authority to transfer consumers' debt settlement funds out of the state of Washington.

278. At the time that assistance was rendered, Defendants were aware of their role in these wrongful activities.

279. Defendants are liable for the entire loss suffered by the Class.

## COUNT VI.
## (BREACH OF FIDUCIARY DUTY)
## (AS AGAINST ALL DEFENDANTS)

280. Meracord was and is a custodial agent of and trustee to Plaintiffs and Class members.

281. Lloyd Ward Defendants agree to act both as an attorney for its customers and as a custodial agent by claiming that it and Defendant Meracord will hold its customers' money in trust for payment to their creditors.

282. Defendants owed fiduciary duties to Plaintiffs and Class members to act for the benefit and safeguard the interests of Plaintiffs and Class members in all matters respecting their custodial, trustee, and attorney roles, including the establishment, maintenance, and management of Plaintiffs' and Class members' debt settlement accounts.

283. Defendants had a duty to use reasonable efforts to provide Plaintiffs and Class members with facts that Defendants knew, had reason to know, or should have known were material to Plaintiffs' and Class members' legal interests.

284. Defendants' fiduciary relationships to Plaintiffs and Class members did not privilege conduct that was tortious or criminal.

285. Defendants negligently and intentionally breached duties owed to Plaintiffs and Class members by, among other things:

(a)   Failing to disclose to Plaintiffs and Class members that their debt settlement contracts, pursuant to which fund transfers were being made, were void;

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 80
Case No. 12-cv-05657-BHS
010262-13 561082 V1



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

(b)   Failing to disclose to Plaintiffs and Class members that fees being paid from their debt settlement accounts were illegal and unearned;

(c)   Initiating transfers of Plaintiffs' and Class members' money for purposes of paying unearned, unfair, and illegal fees;

(d)   Establishing, maintaining, and managing debt settlement accounts in ways designed to evade consumer protections, including limitations on debt settlement fees;

(e)   Paying and receiving unearned, unfair, and illegal fees using Plaintiffs' and Class members' funds; and

(f)   Elevating their own pecuniary interests above those of Plaintiffs and Class members, thereby unjustly enriching themselves at the expense of Plaintiffs and Class members.

286. Defendants materially benefitted from their breaches of fiduciary duties to Plaintiffs and Class members.

287. As a proximate result of Defendants' breach of duties, Plaintiffs and Class members suffered loss and damages, and Defendants were unjustly enriched.

**COUNT VII.**
**(UNJUST ENRICHMENT)**
**(AS AGAINST ALL DEFENDANTS)**

288. Plaintiffs incorporate the previous allegations as if fully set forth herein.

289. As a result of the Meracord scheme, Defendants sold debt settlement services to Plaintiffs and Class members at inflated prices, and collected money and fees that were unreasonable and would not have been collected but for the deceptive and fraudulent actions of the Meracord Enterprise. Defendant Meracord then distributed substantial portions of these funds to Remsberg, and LWA then distributed substantial portions of these funds to Ward.

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 81
Case No. 12-cv-05657-BHS
010262-13 561082 V1



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

290. Defendants are aware of its receipt of the above-described benefits.

291. Defendants received the above-described benefits to the detriment of Plaintiffs and Class members.

292. Defendants continue to retain the above-described benefits to the detriment of Plaintiffs and the Class.

293. As a result of Defendants' unjust enrichment, Plaintiffs and the Class have sustained damages in an amount to be determined at trial and seek full disgorgement and restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

294. Further, Plaintiffs and the Class, individually and on behalf of the public, seek restitution and disgorgement of profits realized by Defendants as a result of its unfair, unlawful and/or deceptive practices.

## PRAYER FOR RELIEF

295. WHEREFORE, Plaintiffs demand judgment as follows:

    (a)    For an order declaring that this action may be maintained as a class action pursuant to Federal Rules of Civil Procedure Rule 23, and for an order certifying this case as a class action and appointing Plaintiffs as representative of the Class;

    (b)    For an order awarding compensatory damages on behalf of Plaintiffs and the Class in an amount to be proven at trial;

    (c)    For judgment for Plaintiffs and the Class on their claims in an amount to be proven at trial, for compensatory damages caused by Defendants' unfair or deceptive practices; along with exemplary damages to each Class member for each violation;

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 82
Case No. 12-cv-05657-BHS
010262-13 561082 V1



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

(d)  For judgment for Plaintiffs and the Class on their RICO and state law claims, in an amount to be proven at trial;

(e)  For restitution of all improperly collected charges and interest, and the imposition of an equitable constructive trust over all such amounts for the benefit of Plaintiffs and members of the Class;

(f)  For an accounting of all credits, disbursements and charges and other benefits associated with Plaintiffs' and Class members' transactions;

(g)  For pre-judgment and post-judgment interest as provided for by law or allowed in equity;

(h)  For an order awarding Plaintiffs and the Class their attorneys' fees and costs; and

(i)  Such other and further relief as may appear necessary and appropriate.

## DEMAND FOR JURY TRIAL

296.  Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demands a trial by jury on all issues so triable.

DATED: October 29, 2012

HAGENS BERMAN SOBOL SHAPIRO LLP

By: /s/ Steve W. Berman
    Steve W. Berman (WSBA# 12536)
    Thomas E. Loeser (WSBA# 38701)
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Tel: (206) 623-7292
Fax: (206) 623-0594
steve@hbsslaw.com
toml@hbsslaw.com

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 83
Case No. 12-cv-05657-BHS
010262-13  561082 V1



**THE PAYNTER LAW FIRM PLLC**

Stuart M. Paynter
1200 G Street N.W., Suite 800
Washington, DC 20005
Tel.: (202) 626-4486
Fax: (866) 734-0622

Celeste H.G. Boyd
1340 Environ Way
Chapel Hill NC 27517
Tel: 505-501-8176
Fax: (866) 734-0622

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 84
Case No. 12-cv-05657-BHS
010262-13  561082 V1



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

## CERTIFICATE OF SERVICE

On October 29, 2012, I caused to be electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following attorneys of record:

- **Pamela Marie Andrews**
  pamela.andrews@andrews-skinner.com, jane.johnson@andrews-skinner.com, kirsten.kenning@andrews-skinner.com
- **Steve W. Berman**
  steve@hbsslaw.com, robert@hbsslaw.com, heatherw@hbsslaw.com
- **Celeste H. G. Boyd**
  cboyd@smplegal.com
- **Jennifer Lauren**
  jennifer.lauren@andrews-skinner.com
- **Thomas E Loeser**
  TomL@hbsslaw.com, dawn@hbsslaw.com
- **Stuart M Paynter**
  stuart@smplegal.com, mgerton@smplegal.com
- **Jeffrey A.O. Freimund**
  jefff@fjtlaw.com

Executed this 29th day of October, 2012, in Seattle, Washington.

HAGENS BERMAN SOBOL SHAPIRO LLP

By:    /s/ Steve W. Berman
          Steve W. Berman

AMENDED CLASS ACTION COMPLAINT
AND JURY DEMAND - 85
Case No. 12-cv-05657-BHS
010262-13  561082 V1



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594